FAIRMOUNT CEMETERY ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55570, 63753, 70639. Promulgated May 16, 1934.

*John A. Stolp, Esq.*, for the petitioner.
*Nathan Gammon, Esq.*, for the respondent.

OPINION.

LANSDON: The petitioner acquired 560 acres of land in 1890, at a cost per acre not disclosed by the record. Carved out of such land it sold certain cemetery lots in 1927, 1928, 1929, and 1930 for amounts which the respondent has determined resulted in large profits. In substantially identical sections, the Revenue Acts of 1926 and 1928 provide that the basis for determining gain or loss from the disposition of property acquired before March 1, 1913, shall be cost, or fair market value at that date, whichever is greater. Although

not proved for the record, all the circumstances indicate that the lands here involved had a fair market value at the basic date greatly in excess of their cost, and we so find.

The land in question was bought by the acre and sold by the square foot. The petitioner bases its claim on an average value at March 1, 1913, of 78 cents per square foot, which was the value fixed upon unimproved lands by the retrospective appraisal made in 1927. The respondent has classified the lands as to their condition on the basic date into improved, partly improved, and unimproved categories, and has determined fair market values thereof in the respective amounts of 80 cents, 40 cents, and 3.968 cents per square foot. Based on the value claimed by the petitioner, its 540 acres of lands not then sold or improved for burial purposes had a fair market value at March 1, 1913, of approximately $34,000 per acre, or $18,000,000 for the entire tract, which seems a little high even for acreage located 10 miles from Denver. The values per square foot as of March 1, 1913, determined by the Commissioner give the acreage values as of that date in the respective amounts of $1,102, $11,020, and $22,040.

It is clear that the value claimed by the petitioner results in an absurdity which impeaches the credibility of all the evidence adduced in its support. The meaning of fair market value is well fixed. It is what property can be sold for at a given date in a transaction in which vendor and vendee are equally free to act. It is true that petitioner has proved some sales of improved lots about two years before March 1, 1913, at prices approximating the values here claimed. The record discloses, however, that at the basic date the land owned by petitioner was sufficient to supply all its demands for burial lots for 200 years. The appraisal of 78 cents per square foot and the expert evidence offered in connection therewith by the petitioner ignores this situation. If it be assumed that all the lots on hand would be sold over a period of 200 years, it follows that on an average the receipt of the sales price by the petitioner would be deferred for 100 years. It would then become necessary to determine the present worth of $34,000, the value per acre claimed in 1913, but not realizable until 2013, which, at a discount rate of 6 percent, would be $100.20.

The facts disclose that in 1911 the petitioner sold 15 acres of its then unimproved land for use as a Jewish cemetery for $15,000. Just what consideration impelled the purchasers to pay $1,000 per acre when similar land just across the road could have been bought for a fraction of that price, is not disclosed by the record, but that is immaterial, since the price so paid was approximately equal to the value of the land at March 1, 1913, as determined by the respondent.

In rebuttal of the testimony of petitioner's experts, the respondent called two real estate dealers who were familiar with land prices at the basic date. They testified that acreage prices in that neighborhood were not in excess of $500 per acre at that time. Undoubtedly the dedication of petitioner's land to cemetery purposes increased its value as compared with nearby agricultural or grazing tracts in the same neighborhood, but respondent has recognized this in his determination of a value for unimproved cemetery lots somewhat in excess of $1,000 per acre. In our opinion the petitioner has failed to overcome the presumption of correctness which attaches to the determination of the respondent.

The basic value of block No. 90, upon which the mausoleum stands, is also an issue in connection with the computation of profit realized from the sale of mausoleum space in the year 1930. This block was unimproved at March 1, 1913, and its fair market value at that date is settled by our affirmation of the respondent's determination as set out above. *Duquesne Steel Foundry Co.*, 15 B.T.A. 467.

The remaining issue relates to petitioner's right to have excluded from its taxable income of the years involved the payments made into a reserve fund, so-called " in trust " to maintain mausoleum properties under contracts with space purchasers.

The exact legal question involved in this last issue was before this Board in different form, but under almost identical facts, in *Acacia Park Cemetery Assn., Inc.*, 27 B.T.A. 233, wherein that taxpayer contended that it had the right to add to the cost of cemetery lots sold the sums paid in to a bank as a " perpetual care fund." Its theory was that its contractual obligation with lot purchasers to perpetually maintain and care for the properties had the effect of imposing a trust upon so much of the purchase payments as was necessary to guarantee its fulfillment. In our discussion of that case we distinguished between sales contracts which provided that a specified portion or percentage of the purchase payments should be segregated as a separate fund and used for perpetual care and those, as then involved, in which the company merely agreed to perform such services. The Board held that in the latter class of cases there was no trust impressed upon any part of the payments reserved, even though the selling agents had represented, orally, to the purchasers that 10 percent was to be held in trust for that purpose; and that such payments not impressed by a trust at the time they were made could not be changed in such respect by any subsequent contract which the cemetery corporation might make with a bank or trust company for its own convenience in carrying out its obligations to its customers. This decision was affirmed by the United States Circuit Court of Appeals for the Seventh Circuit in *Acacia Cemetery Assn., Inc.* v. *Commissioner*, 67 Fed. (2d) 700.

This decision and others equally in point settle the law upon this last issue, and upon authority thereof we affirm the determination of the respondent.

*Decision will be entered for the respondent.*