Cedar Park Cemetery Association, Inc. v. Commissioner.
Cedar Park Cemetery Ass'n, Inc. v. Commissioner
Docket No. 16274.
United States Tax Court
1949 Tax Ct. Memo LEXIS 242; 8 T.C.M. (CCH) 177; T.C.M. (RIA) 49057; March 11, 1949
Leonard L. Cowan, Esq., 10 So. La Salle St., Chicago, Ill., for the petitioner. Gerald W. Brooks, Esq., and David F. Long, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies for the taxable years 1939, 1940, and 1941, as follows: Declared Value
Excess-Profits
Year
Income Tax
Tax
1939
$16,553.52
$3,528.90
1940
10,064.16
None
1941
6,835.94
1,517.92
The above deficiencies *243 resulted in part from respondent's action in increasing gross income by the amounts $24,534.96, $24,163.58, and $18,137.85 for the taxable years 1939, 1940, and 1941, respectively, representing approximately 20 percent of the sale prices of cemetery lots sold by petitioner in those years and claimed to be excludible from gross income because allocated to a perpetual care fund; respondent's action in disallowing as bases for lots sold the amounts of $18,866.45, $14,608.21, and $9,033.53 for the taxable years 1939, 1940, and 1941, respectively; and respondent's action in increasing gross income for the year 1939 by the amount of $41,878.65, which was part of $102,519.99 reported in the 1939 return as nontaxable income for a perpetual care fund "dissolved" and credited to earned surplus. An alternative issue is petitioner's claim for overpayment based upon its rejected claim for refund of $7,503.52 for interest paid in the year 1939 on Federal income tax deficiencies for the years 1923, 1924, and 1925. The parties have submitted a stipulation of facts and a supplemental stipulation of facts which we adopt as our findings of fact herein. Statement of Facts Petitioner was incorporated *244 for profit as a cemetery corporation in 1923 under the General Corporation Act of Illinois. Its principal office is at 6219 South Halsted Street, Chicago, Illinois. Petitioner kept its books on an accrual basis, and filed its Federal income tax and excess-profits tax returns on an acrual basis for the taxable years 1939, 1940, and 1941 with the collector of internal revenue for the first district of Illinois. Leonard L. Cowan was vice-president and E. R. (Goldman) Gardner was secretary-treasurer of petitioner during the years 1933 to 1941, inclusive. During the taxable years Cowan and Gardner each owned 50 percent of petitioner's outstanding common shares. Petitioner's preferred stock was held by a few individuals and was retired from time to time until the outstanding balance in 1945 was $15,700. At the time of the hearing in this case outstanding preferred shares were held as follows: Effie A. Zimmer
100 shares
Leonard L. Cowan Trust
28 1/2 shares
E. R. (Goldman) Gardner Trust
28 1/2 shares
Petitioner's board of directors during the taxable years were Leonard L. Cowan, chairman; his wife, Belle F. Cowan; E. R. (Goldman) Gardner; and his wife, Leonore Gardner. *245 Lots in about 70 percent of the improved portions of petitioner's cemetery are sold exclusively to members of the Masonic Fraternity and Order of Eastern Star and their families, and the balance of the improved sections is open to the general public. The Masonic Fraternity owns no stock in and receives no financial benefits from petitioner's cemetery. Facts Relating to the Perpetual Care Issue No reference was made in petitioner's articles of incorporation or by-laws to a perpetual care fund. A resolution was adopted by petitioner's board of directors on June 6, 1927, authorizing the execution of a perpetual care fund agreement with Lake View State Bank of Chicago and the transfer to that bank of "all moneys or securities now held by the Citizens State Bank, as a Depository for the Perpetual Care Fund of this company." In December, 1934, petitioner and The Chicago City Bank and Trust Company entered into a contract, hereinafter called the 1934 agreement, in which petitioner promised that in compliance with its obligations to lot owners relating to perpetual care it would deposit with the Bank from time to time amounts equal to 10 percent of the net sale prices of lots sold *246 until the aggregate principal amount of the trust estate reached $200,000. The 10 percent might, at petitioner's discretion, be taken from the final 10 percent installment payment of the sale price. Article III of the 1934 agreement provided in part as follows: "ARTICLE III. "POWERS, DUTIES AND LIABILITIES OF THE TRUSTEE. ADMINISTRATION OF TRUST ESTATE. "The Trustee shall have no duty to see to the performance by the Company [petitioner] of the covenants and obligations herein undertaken to be performed by the Company. The Trustee shall have no duty to pay any premium upon any insurance policy now or hereafter forming a part of the trust estate unless it has in its possession sufficient money available for that purpose. The Trustee shall have no duty to see to the care, maintenance or upkeep of the Cemetery * * * it being the intention of the parties to require the Trustee only to hold and deal with the principal assets of this trust estate as herein provided and to disburse the income thereof to the Company for the care, maintenance and upkeep of said Cemetery, the Company's written direction, as hereinafter provided, concerning the disbursement of income for such purposes *247 to be deemed conclusive that such income is used for such purposes, and the Trustee shall not be required or permitted to question any such direction if given in the form and manner hereinafter provided. * * *
"After deducting its costs, expenses and compensation, the Trustee shall invest and reinvest all sums deposited with it by the Company from the sale prices of lots sold in the Cedar Park Cemetery, except such portion thereof as may be necessary to pay the premiums upon life insurance policies in this trust estate contained, which shall be considered as principal contributions, such other sums as may be deposited by the Company and designated as principal and such other sums of principal from time to time remaining in its hands in notes or bonds secured by a first mortgage lien upon real estate in the State of Illinois, in obligations of the United States of America or the State of Illinois or guaranteed both as to principal and interest by the United States of America or by the State of Illinois, or in any other interest or income paying securities which the Trustee may, in its direction, deem desirable, provided, however, that no investment shall be made except by and *248 with the approval of such officer of the Company as shall be designated in writing by the Board of Directors of the Company. * * *
"The Trustee shall have the sole power to claim the proceeds of any policy of insurance in this trust estate contained and to enforce and sue upon any such policy. The insurer in any such policy of insurance * * * is hereby specifically authorized to deal with the Trustee hereunder as the sole beneficiary of any such policy and to pay the proceeds thereof to the Trustee * * *" With respect to income and disbursements, the 1934 agreement required that the trustee use net income first to pay current premiums on insurance policies in the trust estate, and hold any amount remaining subject to petitioner's order in writing as necessary for the "care, preservation, and maintenance" of the cemetery "whether for costs and expenses previously incurred or thereafter to be incurred." The beneficiaries of the trust, by the terms of the 1934 agreement, were petitioner, and the lot owners and their families as a class. Petitioner reserved the right to remove the trustee for any reason which petitioner's board of directors in their sole discretion deemed sufficient. *249 By a resolution adopted on February 1, 1936, petitioner's board of directors ratified and approved the action of its officers in executing the 1934 agreement. That agreement was in effect during the taxable years. Prior to its execution, other agreements as stated below were entered into by petitioner. In September, 1924, petitioner and Citizens State Bank of Chicago entered into an agreement, hereinafter called the 1924 agreement, which provided for the establishment out of petitioner's corporate funds of "an especial trust fund," the proceeds of which were to be paid from time to time to petitioner and to be used by it "to the extent that may be necessary" for the purpose of keeping the cemetery in repair. The remainder of the income was to be used "for such other corporate purposes of said company as its Board of Directors and proper officers may, from time to time, determine * * *." At the time of executing the 1924 agreement, petitioner deposited $1,000 with Citizens State Bank and agreed to increase the fund to a principal amount of $25,000 within one year. However, no deposits except the original $1,000, were made by petitioner in 1924 or 1925 under the 1924 agreement. Other *250 sums which were deposited from time to time in 1926 and 1927 brought the aggregate of deposits under the 1924 agreement to $16,652.50. In June, 1927, petitioner and Lake View State Bank of Chicago entered into a trust agreement, hereinafter called the 1927 agreement, under which an initial deposit of $15,000 was made. Provision in the 1927 agreement for using the proceeds in repair of the cemetery were substantially the same as those in the 1924 agreement. Deposits made in 1927 under the 1927 agreement brought the total fund to $15,615. In January, 1931, petitioner and Chicago City Bank and Trust Company entered into a trust agreement hereinafter called the 1931 agreement, which provided that petitioner would from time to time add to its initial deposit of $27,100 until the fund amounted to at least $200,000, and that until such total was reached 5 percent of the net sale price of cemetery lots, to be taken from the final payment made by lot purchasers, was to be deposited. In 1931 certain policies of term life insurance of $25,000 each were issued by New York Life Insurance Company upon the life of Leonard L. Cowan who made application for the policies. In all policies the insured *251 retained the right to change the named beneficiary, who was the Chicago City Bank and Trust Company. These policies were never in possession of the Bank, but were delivered to and remained in possession of petitioner until January, 1935, when petitioner caused them to be converted, effective as of October 1, 1934, into four policies of ordinary life insurance for $25,000 each, with annual premiums of $917.50 each. The right of the insured to change beneficiaries was retained in the new policies, and on February 18, 1936, the beneficiary in each policy was changed from Chicago City Bank and Trust Company, as trustee under the 1931 agreement, to insured's executors, administrators or assigns. On February 28, 1936, the insured assigned the policies to petitioner which in turn on March 2, 1936, assigned and delivered the policies to Chicago City Bank and Trust Company, as trustee, in accordance with the terms of the 1934 agreement. Between October 31, 1931, and December 31, 1934, petitioner paid premiums on the original policies issued in 1931 in the amounts of $2,979.75, $4,679, $4,666, and $3,625.45, respectively. Those premium payments, in the aggregate amount of $15,950.20, were *252 recorded on petitioner's books as a credit to the "Perpetual Care Fund" account and a debit to the "Perpetual Care Reserve" account. Fiduciary returns were filed by Chicago City Bank and Trust Company for the trust created by the earlier 1931 agreement, under the name of "Cedar Park Cemetery Association, Trust No. 563," naming the bank as fiduciary, and reporting excess of income over deductions as distributable to beneficiaries leaving no income taxable to the fiduciary. The fiduciary return for 1937 reported petitioner as beneficiary of net income in the amounts of $871.24, taxable, and $72.19, exempt. Chicago City Bank and Trust Company as trustee under Trust No. 2177, created by the 1934 agreement, filed no fiduciary returns for the years 1934 to 1941, inclusive. From January 1, 1939, to June 22, 1939, petitioner sold its cemetery lots under contracts which recited, in part: "The purchase price hereof shall include Perpetual Care of the above described lot out of the Perpetual Care Fund set aside for such purpose by CEDAR PARK CEMETERY ASSOCIATION, INC." During the remainder of the taxable years, from June 22, 1939, to December 31, 1941, lots were sold under contracts containing *253 identical terms, except that, in addition to the provision quoted above, the following was added by rubber stamp: "INCLUDES 20% PERPETUAL CARE." This increase of 10 percent over the 10 percent specified in the 1934 agreement was authorized by a resolution adopted by petitioner's Board of Directors on June 22, 1939, as follows: "WHEREAS, it is necessary that this company make additional provision for the accumulation of funds in the perpetual care fund for the care and maintenance of Cedar Park Cemetery in accordance with agreements with lot owners and the agreement of this company dated December 28th, 1934. "NOW, THEREFORE, BE IT RESOLVED That beginning with the year 1939, in each year that the company's net sales shall exceed $60,000, twenty percent of all sales made in that year shall be placed in said perpetual care fund until said fund has reached the sum of $200,000, and until changed by the Board of Directors." Similar resolutions for the years 1940 and "1941 and until further ordered" were adopted on January 8, 1940, and January 2, 1941, respectively. During the taxable years petitioner issued deeds to lot purchasers containing the following provisions: "The above *254 described lot shall be entitled to perpetual care according to the provisions of the agreement executed by said Cedar Park Cemetery Association, Inc., providing for the perpetual care for said cemetery." Practically all sales in the taxable years were paid for in installments, and deeds were issued when all installments had been paid. Beginning in early 1934 petitioner recorded sales of cemetery lots in customers' ledgers wherein 10 percent of the selling price (increased to 20 percent after June 22, 1939) was entered in a column headed "Perpetual Care," and the balance of the contract price was entered in an adjoining column headed "Amount." Petitioner also recorded its sales on its books of account on the accrual basis in the form shown by the following example: Dr.
Cr.
Accounts receivable installment
contracts
$900.00
Accounts receivable perpetual
care
100.00
Sales
$900.00
Perpetual Care Liability (Sales)
100.00 After June 22, 1939, the entries were identical except that 20 percent of the contract price was allocated to perpetual care. When collections were made under sales contracts, the first 90 percent was debited to "cash" and credited *255 to accounts receivable. After June 22, 1939, identical entries were made except that percentages of 80 percent and 20 percent were used. Petitioner has at all times allocated all payments made by lot purchasers to the contract prices of their lots until the particular purchaser has completed payment of 90 percent of the contract price, or 80 percent after June 22, 1939. During the taxable years petitioner's ledger included an account designated "Accounts Receivable (Payable) Perpetual Care Fund (Drawing Account)." The debit or credit balance in that account as at December 31, 1938, 1939, 1940, and 1941, the aggregate payments to Chicago City Bank and Trust Company, trustee under the 1934 trust, debited to the account, and the aggregate credits to the account in each of the taxable years were as follows: Aggregate Bank
Dr. (or Cr.) Balance
Payments
Aggregate
as at December 31
Debited
Credits
1938 - Dr. $6,622.43
1939 - Dr. 4,554.68
$ 3,752.50
$ 5,832.00
1940 - Cr. 990.25
4,004.24
9,549.17
1941 - Cr. 907.73
15,039.57
15,664.90 The credits entered in the above account in each year represent transfers thereto of various totals, usually made monthly, *256 of payments received applying on the final 10 percent or 20 percent of the contract price of lots sold. Amounts received by the trustee from petitioner during the taxable years, as recorded on the trustee's books, were identical to the aggregate bank payments so debited to the account on petitioner's books, and were described as follows: For Deposit in
For Premium
Perpetual
Year
Payments
Care Fund
Totals
1939
$3,752.50
$ 3,752.50
1940
2,835.00
$ 1,169.24
4,004.24
1941
15,039.57
15,039.57
Prior to December 31, 1940, collections for perpetual care on outstanding contracts were not sufficient to enable the trustee to meet premiums on the life insurance policies assigned under the 1934 agreement. As such premiums became due, petitioner advanced sufficient amounts to cover them, recorded as debits in the above account. As of about December 31, 1940, the credits to the above account became sufficient to produce a credit balance, and thereafter payments were made monthly by petitioner to the trustee. During the taxable years, Chicago City Bank and Trust Company, trustee under Trust No. 2177 created by the 1934 agreement, used the income and *257 so much of the principal of the trust as was necessary to pay premiums on the life insurance policies on the life of Leonard L. Cowan. In 1942 the Chicago City Bank and Trust Company paid petitioner the amounts of $62.50, representing the balance of income cash on hand as of December 31, 1941, and $250, reimbursement of expenditures for maintenance of the cemetery for the calendar year 1942. Similarly, in 1944, the Bank paid petitioner $752.91, reimbursement of expenditures for maintenance in 1944. Petitioner, with respect to the care of its cemetery, claimed and was allowed the following deductions in its returns for the taxable years: Item of Expense
1939
1940
1941
Supt. and Labor
$11,508.14
$10,329.20
$11,476.55
Material
1,147.20
1,504.64
1,572.61
Machinery and Equipment Repairs
500.47
1,041.95
432.20
Supplies and Road Repairs
10,007.36
Supplies and Maintenance
4,131.38
1,428.86
Gasoline and Oil
550.97
674.66
449.96
Fuel
255.67
209.75
165.70
Water
189.21
400.82
329.09
Telephone
258.87
250.87
296.20
Light
228.50
268.18
269.77
Insurance
552.36
652.95
387.06
Totals
$25,168.75
$19,464.40
$16,808.00
The following *258 schedule shows the amounts excluded by petitioner before reporting gross income as representing the 20 percent of sales allocable to perpetual care; and the gross sales, returns and allowances, and net sales reported by petitioner in its returns for the taxable years: Allocated to
Returns and
Year
Perpetual Care
Gross Sales
Allowances
Net Sales
1939
$24,534.96
$103,691.55
$17,689.12 *
$86,002.43
1940
24,163.58
96,654.32
12,332.05
84,322.27
1941
19,137.85
72,551.40
12,021.56
60,529.84
In his notice of deficiency respondent stated under caption "Explanation of Adjustments": "(a) In filing your corporation income and declared value excess-profits tax return you excluded from gross sales the amount of $24,534.95 ** for the taxable year 1939, which you contend represents the portion of sales allocable to perpetual care. It is held that this amount is includible in gross income under the provisions of section 22(a) of the Internal Revenue Code. It is further held that no portion of such amount is deductible within the meaning *259 of section 23(a) or any other provision of the code." Explanations of adjustments for 1940 and 1941 were identical, except that the amounts by which respondent increased gross income in those years were $24,163.58 and $18,137.85, ** respectively. Facts Relating to Cost of Lot Sales Issue In 1923, the year of its incorporation, petitioner purchased 66 2/3 acres of undeveloped lands in Burr Oak, Illinois, a suburb of Chicago, and proceeded to improve 35.02 acres, hereinafter called "Old Section." Petitioner estimated Old Section to contain 2070 lots consisting of 16 grave sites each. Petitioner increased the costs to be recovered from sale of lots from Old Section by $136,620, which was credited to a "Perpetual Care" reserve account and represented an amount of $66 per lot for 2070 lots, estimated as necessary to provide future perpetual care. In 1924 petitioner acquired a second tract of land comprising 26 2/3 acres. On petitioner's books the cost are shown as $61,500 for the first purchase and $56,000 for the second. In its Federal income tax returns for 1923, 1924, and 1925, petitioner included $66 per lot *260 for perpetual care in its costs as a deduction from sales. Respondent determined deficiencies based on disallowing the $66 per lot deduction. Petitioner's appeal to the Board of Tax Appeals, Docket Nos. 32197 and 40854, resulted in the Board's sustaining respondent in a Memorandum Opinion entered December 29, 1932, and affirmed in 67 Fed. (2d) 699. Deficiencies found by the Board in its final order, entered March 6, 1933, were based on petitioner's claimed total cost of $569,112.63 (after excluding the $136,620). The deficiencies under the Board order were based on a per-lot cost computed by dividing the revised cost by 1804, the figure agreed upon at the hearing to be the correct number of saleable lots, and the basis for each year's sales was found by multiplying the cost per lot by the number of lots sold in each year. In petitioner's returns for 1926 to 1930, inclusive, the cost per lot included the $66 per lot for perpetual care. In 1927 petitioner improved an additional 16 1/3 acres hereinafter called "New Section," estimated to contain 995 lots of 16 graves each. Petitioner included in the book cost of New Section $34,300 as cost of land. In its returns for the *261 years 1926 to 1930, inclusive, petitioner reported and was allowed deductions for cost of lots sold as follows: Total Allowed
Total
Old
New
Claimed
Section
Section
1926
$41,517.88
$33,630.89
1927
30,418.09
18,627.15
$ 5,578.44
1928
45,565.00
6,145.19
39,419.81
1929
42,398.57
7,209.18
35,189.39
1930 (amended
return)
25,296.93
(862.81) *
26,159.74
Respondent determined a deficiency for the year 1932, from which petitioner appealed to the Board of Tax Appeals, Docket No. 95311. Among assignments of error were disallowance of deductions for amounts paid as premiums on life insurance policies insuring the life of petitioner's president; and disallowance of the amount actually placed in the perpetual care fund in 1931. The Board proceeding was closed by order entered October 4, 1940, pursuant to stipulation of deficiency. An adjusted net loss of $813.91 for 1931 was allowed as a deduction for the year 1932. As part of the settlement, petitioner waived its claim for inclusion in costs of premiums paid on life insurance policies, and amounts paid into perpetual care fund in 1931. Respondent *262 accepted adjusted costs as of December 31, 1931, and December 31, 1932, for the Old and New Sections as follows: Old Section
New Section
Cost as
Cost
Year
Redetermined
1927 to date
1931
$386,196.50
$118,093.10
1932
386,997.45
118,324.80 Cost of lots sold was determined in the recomputation for 1931 and 1932, by dividing the adjusted costs of Old and New Sections by the total number of lots in each (1804 and 995, respectively) and multiplying by the number of lots sold in each year. In 1938 petitioner began improving a third section, hereinafter called "Birch Section." Total costs for Birch Section to December 31, 1938, aggregated $6,044.33, including $3,934.80 for cost of land. Birch Section was estimated to contain 236 lots, 29 of which were sold during 1938 and charged out at a cost of $745.13. Petitioner's losses and net lot-sales for the years 1926 to 1930 and 1933 to 1938, inclusive, as reported in its returns for those years, were as follows: Lots Sold
Loss Reported
Year
on Tax Returns
Old
New
Birch
1926
$32,262.79 (original)
119 1/2
24,375.92 (adjusted)
1927
41,030.59 (original)
26,927.25 (adjusted)
66.2
28
1928
27,031.60
113.5
23.2
1929
1,789.07
21
133
1930
4,711.60 (original)
17,416.48 (amended)
11 3/16
118 15/16
1933
$15,538.84
14.50
29.25
1934
6,079.99
17.37
24.75
1935
6,561.23
16.06
22.62
1936
8,055.02
17.25
25.37
1937
4,909.44
27.35
26.37
1938
4,338.26
23.75
16.43
29
*263 In determining the cost of lots sold, in its return for the year 1938, petitioner used costs as follows: Section
Cost of Lots
Old
$569,122.45
New
198,230.00
Birch
6,044.33
In 1940 petitioner improved a fourth section, hereinafter called "Fourth Improvement," estimated to contain 198 lots, at a land cost of $3,521.58 and an improvement cost of $2,753.08. In 1941 the section was increased by 347 1/2 lots, and the Fourth Improvement cost on petitioner's books was increased by $4,324.25 for land and $1,846.83 for improvements. 29 lots were sold in 1941. During the taxable years petitioner expended in Old Section, New Section, Birch Section, and Fourth Improvement the following amounts: Section
1939
1940
1941
Old
$ 147.93
$ 161.10
New
23.24
238.73
Birch
7,480.38
1,248.21
$ 117.79
Fourth Improve-
ment
2,753.08
1,846.83
Unsold lots on hand on December 31, 1938, and net lots sold from the four sections of the cemetery during the taxable years, were as follows: Unsold Lots
Net Lots
Net Lots
Net Lots
on Hand
Sold
Sold
Sold
Section
Dec. 31, 1938
1939
1940
1941
Old
309.31
19.81
25.00
18.56
New
260.80
27.18
42.37
27.68
Birch
207.00
109.75
42.75
12.62
Fourth Improvement
19.00
29.25
*264 The total corrected costs on December 31, 1938, were as follows: Section
Cost of Lots
Old
$388,863.06
New
121,093.78
Birch
6,044.33
From its incorporation in 1923 to December 31, 1938, petitioner deducted costs in its Federal income tax returns (some of which were adjusted) of $627,882.47, of which $745.13 applied to Birch Section. By reason thereof petitioner had recovered prior to January 1, 1939, an amount of $111,881.30 in excess of its total corrected cost of $516,001.17 from sale of lots in Old, New, and Birch Sections. In the notice of deficiency respondent stated under "Explanation of Adjustments": "(c) On line 2 of your return under gross income you deducted $18,866.45 as cost of goods sold for the year 1939. Since the basis of your entire tract of land has been more than fully recovered by January 1, 1939, it is held that no further basis is allowable as a deduction from sales. Accordingly, the foregoing amount has been restored to income." Explanations of adjustments for 1940 and 1941 were identical except that the amounts disallowed as deductions from sales in those years were $14,608.21 and $9,033.53, respectively. Facts Relating to the *265 Dissolved Perpetual Care Fund Issue On December 31, 1923, petitioner set up on its books a reserve for perpetual care in the amount of $119,064 by debiting that amount to cost of unsold lots and crediting the reserve account. This sum was computed by multiplying 1,804 lots in Old Section by $66 per lot, estimated as necessary for future perpetual care. On December 31, 1925, the reserve account was increased by a second credit in amount of $17,556, computed by multiplying 266 cemetery lots by $66 per lot. It was at that time estimated that there were 2070 rather than 1804 lots in Old Section. On December 31, 1926, the reserve account was decreased by $3,155.63, it being estimated at that time that there were 2,022 3/16 rather than 2,070 lots in Old Section. On December 31, 1927, the reserve account was increased by a third credit in amount of $65,670, computed by multiplying 995 lots in New Section by $66 per lot. The credit balance in the reserve account on December 31, 1933, was $199,134.37. At that time that account was closed by the following journal entry: Dr.
Cr.
Surplus
$111,736.07
Perpetual Care Reserve
199,134.37
Unsold lots - New Section
$ 25,022.25
Unsold lots - Old Section
31,163.67
Perpetual Care Fund Principal
29,449.09
Perpetual Care Fund Interest
235.43
Good will
225,000.00
*266 As a part of the same adjustment to the books, and in the year 1933 but entered as of February, 1934, petitioner made a new credit to the perpetual care reserve in amount of $131,913.38, with a corresponding debit to surplus account, to "set up liability for 1,998 11/16th subdivided lots sold which includes perpetual care at $66.00 per section." On December 31, 1934, the reserve account was debited by the amount of $15,950.20, representing the insurance premiums paid between October 31, 1931, and October 1, 1934, on the life insurance policies described above. At the same time, the reserve account was debited by the amount of $29,449.09 to "Transfer Record of Securities Bought to the Liability for Reserve for Sales Made to December 31, 1931." This $29,449.09 represented all deposits to perpetual care funds from 1924 to October 31, 1931, inclusive. The reserve account was further debited by the amount of $16.50, being an adjusting entry; so that on December 31, 1934, the reserve had a credit balance of $86,497.59. On January 1, 1935, adjusting credits in the amount of $110.27 left a credit balance of $86,607.86. On December 31, 1936, the last entry was made in the account, when a *267 part of the above entry of December 31, 1934, was in effect reversed, and the reserve was credited and surplus was debited by the amount of $15,912.13, representing the total premiums paid on the above insurance policies prior to October 1, 1934. The credit balance of the perpetual care reserve in the year 1939 was $102,519.99, when it was closed out by a debit to the reserve account and a credit to surplus. Petitioner's losses as reported in its returns for the years 1926 to 1930 and 1933 to 1938, inclusive, are set forth above. In its return for the taxable year 1939 petitioner reported as non-taxable income a credit to surplus of $102,519.99, explained as "Dissolved Old Perpetual Care Fund." In his notice of deficiency respondent stated: "(d) Included in Schedule 9 of your income tax return for the year 1939 is the amount of $102,519.99 shown as nontaxable income for a perpetual care fund 'dissolved' and credited to earned surplus. It is held that $41,878.65 of this fund, which in reality was a reserve represents taxable income for the year 1939, being the amount of benefits had by you from this item in prior year's deductions from gross income." Facts Relating to Refund *268 Claim for Interest Paid Deduction Petitioner kept its books and filed its returns for the taxable years on an accrual basis. On March 31, 1939, petitioner paid $14,714.58, representing interest on the Federal income tax deficiencies for the years 1923, 1924, and 1925 referred to above. This interest payment consisted of $7,210.96 accrued to April 29, 1933, the date of the assessment of $14,845.55 tax and $7,210.96 interest, and $7,503.62 accrued from April 29, 1933, to March 31, 1939, the date of payment. Petitioner deducted $6,702.53 in its returns prior to the year 1939, on account of this interest accrued. Petitioner deducted an additional amount of $177.56 in its return for the year 1939, which deduction was not disallowed by respondent. Petitioner filed a claim for refund on March 6, 1944, for the taxable year 1940, containing the following statement: "On 1940 income tax return, taxpayer failed to include item of $7,503.62 interest paid in its deductions. If this had been done, it would have shown a deficit in income for that year and no tax would have been payable." In the notice of deficiency respondent stated: "Your contention that you failed to deduct and should *269 be allowed an additional deduction of $7,503.52 in either year 1939 or 1940 for interest paid in 1939 on Fereral income tax deficiencies for the years 1923, 1924 and 1925 cannot be conceded for the reason that $177.56 thereof was deducted and allowed for 1939 as interest on interest, and the balance represents interest accrued prior to the year 1939." Opinion Petitioner, keeping the accounts of its cemetery business on an accrual method, customarily records as income the amounts due on all sales of cemetery lots sold during the current year. It simultaneously deducts an amount dedicated for perpetual care. The propriety of this item presents the first issue. Petitioner also offsets an amount purporting to represent its basis for the lots sold, which in the years before us respondent has disallowed and which raises the second issue. Whether the amount required to be set aside in the perpetual care fund is thought of as a diminution of the purchase price of the lot itself, see Community Mausoleum Co., 33 B.T.A. 19, or, being an obligation undertaken by petitioner in connection with the entire agreement, is regarded as an accruable deduction, see Parkview Memorial Association, 34 B.T.A. 406 *270 need not be determined. American Cemetery Co. v. United States (D.C. Kans.), 28 Fed. (2d) 918. In either event the provision in the contracts with the lot purchasers, coupled with the resolution adopted by petitioner's board of directors, convinces us that a present and continuing obligation to segregate the funds existed and that the perpetual care funds were properly excluded from the net amount of accruable receipts. Evergreen Cemetery Association, 21 B.T.A. 1194; Community Mausoleum Co., supra.
The percentage involved was changed during the taxable period from 10 percent to 20 percent. If we are correct in our view of petitioner's relationship to its lot purchasers, however, the amount deductible from the gross proceeds, and which petitioner was obligated to set aside, was the larger amount during the latter portion of the period. See Portland Cremation Association (C.C.A., 9th Cir.), 31 Fed. (2d) 843, reversing 10 B.T.A. 65. Petitioner concedes that its deduction of the 20 percent figure for the earlier period was erroneous. The second issue must yield to the fundamental principle that property purchased in *271 bulk is to be dealt with by attributing an aliquot portion of the basis to its several parts where these are disposed of separately. Regulations 103, section 19.22(a)-11; Hollywood, Inc., 10 T.C. 175, acq. 1948-1 C.B., 2; Heiner v. Mellon, 304 U.S. 271; Leake v. Commissioner (C.C.A., 6th Cir.), 140 Fed. (2d) 451, certiorari denied, 323 U.S. 722. Respondent's contention that he permitted petitioner in prior years to offset so large a portion of the cost against earlier sales that no part of the original basis remains cannot alter the principle. Commissioner v. Laguna Land & Water Co. (C.C.A., 9th Cir.), 118 Fed. (2d) 112. The question is as to the gain realized in the instant tax years from the sale of the lots that were sold in those periods. That is to be determined by setting off against the amount realized the cost or other basis for that property, which in the case of a bulk purchase must be the appropriate portion of the total basis. It would not matter that the lots were personalty, Leake v. Commissioner, supra, but in fact they constituted an interest in realty. Community Mausoleum Co., supra. *272 The question is hence not what is the basis for the entire property but what is the basis for the lots sold in the instant years. On that narrow issue we see no error in the figures employed by petitioner. The same approach disposes equally of the question of the extent to which adjustments for the expense of improvements to the property must be allocated to the individual sales. Commissioner v. Laguna Land & Water Co., supra. The final issue is whether petitioner's transfer to surplus in the tax years before us of a "reserve" created and discarded in previous periods constitutes income. The "reserve" was established during petitioner's early history to deal with the perpetual care problem. The very amounts which on the authority of Acacia Park Cemetery Association v. Commissioner [1] were denied as deductions to this petitioner in Cedar Park Cemetery Association v. Commissioner [2] were the credits to the "reserve" by which it was established. There was no justification for the creation of such a reserve nor for the deductions which went to make it up in the first place. In Fairmount Cemetery Association, [3] the Acacia Park case was the authority for a holding stated *273 in the headnote to be "that petitioner may not treat such deposits as allowable reserve charges and deduct them from its current income in the year made." (Italics added.) The present effort to add to petitioner's income on account of deductions taken in the years prior to 1932 is thus no more than an attempt currently and by indirection to reopen those years, and must consequently fail. Greene Motor Co., 5 T.C. 314, 317. If there was an appropriate time for increasing petitioner's net income on account of the items constituting the "reserve," it would hence not have occurred in any of the periods in issue here. The foregoing disposition renders unnecessary consideration of an alternative contention of petitioner respecting interest deductions. Because of adjustments in the deficiency notice not contested by petitioner, Decision will be entered under Rule 50. Footnotes
*. $17,689.16 is stipulated as the actual amount of returns and allowances for 1939.↩
**. Stipulated as $24,534.96 and $19,137.85, respectively.↩
*. Due to excessive returned sales.↩
1. (C.C.A., 7th Cir.), 67 Fed. (2d) 700↩. 2. (C.C.A., 7th Cir.), 67 Fed. (2d) 699↩. 3. 30 B.T.A. 740, reversed other issue (C.A.D.C.), 79 Fed. (2d) 163↩.