# United States Tax Court

T.C. Memo. 2023-122

HYATT HOTELS CORPORATION & SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 13858-17.                    Filed October 2, 2023.

————

*Carter Cabell Chinnis, Jr.*, *Maria C. Critelli*, *John T. Hildy*, *Tyler M. Johnson*, *Thomas Lee Kittle-Kamp*, *Anthony D. Pastore*, *William A. Schmalzl*, *Joshua M. Schneider*, *Scott M. Stewart*, *Gary B. Wilcox*, and *Joel V. Williamson*, for petitioner.

*James M. Cascino*, *David B. Flassing*, *Angela B. Reynolds*, *H. Barton Thomas*, and *Thomas D. Yang*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, *Judge*: Since 1987, Hyatt Hotels Corp. and Subsidiaries (Hyatt) has operated a customer rewards program, known as the Gold Passport Program (Program). Participating travelers who stayed at Hyatt-branded hotels received rewards points, which when amassed in a sufficient number could be redeemed for a free stay at any Hyatt-branded hotel. Hyatt owned roughly 25% of all Hyatt-branded hotels; the rest were owned by a variety of third parties, who contracted with Hyatt for use of its hotel management services and/or its brand name and other intellectual property. When a participating traveler received rewards points for a stay at a Hyatt-branded hotel, Hyatt required the hotel owner to make a payment into an operating fund, which was held by a Hyatt subsidiary and known as the Gold Passport Fund (Fund). When a participating traveler redeemed rewards points for a stay at a

**Served 10/02/23**

[*2] Hyatt-branded hotel, Hyatt would make a compensation payment to the hotel owner out of the Fund. Portions of the Fund's unused balance were invested in marketable securities and resulted in realized gains and accrued interest. Hyatt also used the Fund to pay administrative and advertising expenses that it determined were related to the Program.

For federal income tax purposes, Hyatt essentially ignored the Fund, including none of its revenue in gross income and claiming no deductions for expenses paid. The Commissioner audited Hyatt's returns and determined that this tax treatment was improper. Going a step further, the Commissioner determined that Hyatt's treatment was a method of accounting and that Hyatt thus must include in income as a transitional adjustment its net revenue from the Program since 1987. The Commissioner issued a notice of deficiency memorializing those determinations, and Hyatt timely filed a Petition with this Court. Hyatt maintains that its treatment of the Fund was proper, arguing that it held the Fund as a trustee, agent, or conduit for the hotel owners and not as the true owner for federal income tax purposes. In the alternative, Hyatt contends that the Commissioner overreached by characterizing its treatment as a method of accounting and thus the transitional adjustment should not be sustained. Also in the alternative, Hyatt contends that it should be able to offset its gross receipts with the estimated cost of future compensation payments to hotel owners by way of a longstanding regulatory provision known as the trading stamp method.

Accordingly, the issues for decision are (1) whether Program payments received, interest accrued, and investment gains realized were includible in Hyatt's gross income for tax years 2009, 2010, and 2011 (years at issue); (2) whether a change in Hyatt's tax treatment of such receipts constitutes a change in method of accounting subject to section 481 adjustment; and (3) whether Hyatt may adopt the trading stamp method with respect to the years at issue.[1]

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                         FINDINGS OF FACT

I.      *Hyatt*

Hyatt is a corporation organized under the laws of Delaware.[2]  At all relevant times, including when it timely filed the Petition in this case, Hyatt's principal office was in Illinois.  During the years at issue Hyatt was the U.S. consolidated parent for the Hyatt group of companies for federal income tax purposes.  Petitioner's wholly owned subsidiary, Hyatt Corp., was its primary relevant operational subsidiary, housing its executive-level personnel.  We will refer to Hyatt, Hyatt Corp., and other relevant subsidiaries collectively as petitioner.[3]

II.     *Petitioner's Business*

Petitioner is a well-known hospitality provider which owns, leases, manages, and franchises hotel, residential, and timeshare properties (Hyatt-branded hotels) in the United States and internationally.  During the years at issue petitioner owned (in whole or in part) or leased a number of Hyatt-branded hotels.  Petitioner was the largest single owner of all Hyatt-branded hotels, owning approximately 20%–25% of all Hyatt-branded hotels during the years at issue.  The remaining approximately 75%–80% of Hyatt-branded hotels were owned by a variety of third-party hotel owners (TPHOs).  Some of the TPHOs had entered into hotel management agreements with petitioner, appointing petitioner as their agent to manage and operate a particular hotel for a set term.  In managed hotels, Hyatt employees would be stationed on site and handle day-to-day operations.  Under the management agreements, the TPHO would pay petitioner a base fee, consisting of a percentage of the hotel's gross revenue, and an incentive fee, consisting of a percentage of some profitability measure.

Other TPHOs entered into more limited franchise agreements with petitioner, in which petitioner would license Hyatt intellectual property for a set term to the TPHO, which would operate the hotel itself

---

[2] Hyatt was formerly known as Global Hyatt Corp., before changing its name in June 2009.  In November 2009 Hyatt completed an initial public offering and became a publicly traded company.

[3] The Court issued protective orders adopting procedures to protect petitioner's trade secrets and other confidential information during this case.  The facts set forth in this Opinion have been adapted accordingly.  All information included herein has been determined by the Court not to constitute "trade secrets or other confidential information" within the meaning of section 7461(b).

[*4] or engage a separate management company to do so. Under the franchise agreements, the franchising TPHO would pay petitioner an upfront application fee and monthly royalty fees consisting of a percentage of its gross revenues (generally ranging from 4% to 6% and escalating over the franchise agreement's term). The franchise agreements typically included a provision by which petitioner expressly disclaimed the existence of an agency relationship between it and the TPHO.

The inventory of Hyatt-branded hotels was not static during the years at issue. Certain hotels owned by TPHOs, whether managed or franchised, sometimes removed their affiliation with the Hyatt brand, in a process known in the hospitality industry as "deflagging." Deflagging was not an uncommon occurrence for petitioner (or for the hospitality industry writ large), and hotels left the Hyatt chain during the years at issue. Conversely, during the years at issue new TPHOs entered into management or franchise agreements with petitioner. Petitioner also acquired, leased, or entered into joint ventures that added new Hyatt-branded hotels to the chain. During the years at issue a small number of hotels already within the Hyatt chain shifted ownership from a TPHO to petitioner itself or vice versa.

Petitioner maintained a number of different sub-brands intended to appeal to different market segments. For instance, its Hyatt Place line of hotels was marketed for business travelers, while its Park Hyatt line was marketed for customers interested in a more upscale leisure experience. During the years at issue the majority (approximately 50%) of all Hyatt-branded hotels were marketed under the Hyatt Regency sub-brand, which was marketed to both business and resort travelers. Some of the sub-brands were traditional, full service hotels, while others were select service hotels with only limited food and beverage amenities and no business or banquet facilities. Certain sub-brands also marketed residential apartment units and timeshare vacation properties. A key aspect of petitioner's business strategy was maintaining a consistent positive customer experience across the hotels in each sub-brand.

III. *The Program*

During the years at issue petitioner operated the Program as well as the Fund. Petitioner initiated the Program in April 1987. Petitioner created the terms and conditions of the Program for members; per the terms, only an officer of petitioner was authorized to modify the terms. The terms stated in relevant part that petitioner retained the right to

**[\*5]** change significant aspects of the Program, including the points requirements for member redemption of awards.[4] The terms also stated that petitioner "has the right to end the [Program] by providing written notice to then Active Members six months in advance." Finally, the terms stated that "[a]ccrued points do not constitute property of the Member" and "are not transferable to another person for any reason." The Program was operated by a team of individuals employed by petitioner's marketing department. Proposed changes to the terms of the Program were reviewed and approved by senior executives employed by petitioner.

Pursuant to the terms, customers could enroll as Program members and earn rewards points based on their eligible spending at Hyatt-branded hotels.[5] Customers could become Program members by visiting petitioner's website, calling petitioner's call center reservation phone line, or physically visiting a Hyatt-branded hotel's front desk. During the years at issue members earned Program rewards points at a rate of five points per dollar of eligible spending. Alternatively, customers could opt to receive a number of travel miles, redeemable with one of petitioner's third-party travel partners.[6] Members could also convert already-earned rewards points into travel miles with one of petitioner's travel partners. Petitioner would sometimes run limited-time promotions in which members could earn bonus numbers of rewards points or miles for a qualifying stay. Not all bookings at Hyatt-branded hotels were eligible for rewards points. For instance, if a member booked a stay through a third-party intermediary, such as

---

[4] Hyatt exercised this right on occasion; for instance, in 2010 Hyatt added a new rewards category that effectively required a higher rewards points balance to redeem for stays at particular hotels.

[5] If members met a particular amount of qualified spending at Hyatt-branded hotels, they would graduate to becoming higher tier program members, which entailed some additional perks during their stays.

[6] Customers did not need to be Program members to receive travel miles for their eligible spending, so long as they were members of a participating travel partner's corresponding frequent traveler program. The travel partners included a number of domestic and foreign airlines and Amtrak. Petitioner had entered into a number of agreements with the various travel partners in order to make travel miles available for members, with petitioner being liable to make compensation payments to the travel partner when miles were awarded.

[*6] Expedia or Booking.com, instead of through petitioner directly, that member would not receive rewards points for the stay.[7]

Members could redeem their rewards points to pay for hotel stays, room upgrades, and other goods and services at Hyatt-branded hotels.[8] The various Hyatt-branded hotels were placed within tiered award categories, which required set numbers of points for particular stays or services. In 2009 the lowest award category for a one-night free stay was 5,000 points, while the highest was 27,000 points. Effective June 4, 2010, petitioner reclassified the categories of a number of Hyatt-branded hotels and added a new sixth category.

Members could not redeem rewards points for cash. During the years at issue the Program's terms and conditions did not state that rewards points would expire. However, during the years at issue Hyatt personnel involved with the Program had discussions about changing the Program so that earned rewards points would expire if not redeemed within a certain period. In 2012 petitioner implemented that change, making rewards points expirable after a certain period of inactivity by a member.

Petitioner considered the Program highly successful and a central component of its marketing efforts. Petitioner's internal analytics indicated that Program members tended to stay at Hyatt-branded hotels more frequently and longer. During the years at issue the Program experienced incremental growth. At the end of 2009, the Program had over 9 million members with members having booked 23.4% of total room nights at Hyatt-branded hotels that year. By the end of 2011, the Program had over 12 million members with members having booked 30.3% of total room nights at Hyatt-branded hotels that year. The percentage of hotel stays booked by members varied for each hotel; for instance, a flagship hotel, such as the Grand Hyatt New York (owned by petitioner), would historically tend to have a higher percentage of stays by members.

---

[7] This arrangement was consistent with the financial self-interest of the hotel owners, including petitioner, who would be charged additional commission fees for stays booked through third-party intermediaries.

[8] When a hotel deflagged from the Hyatt brand, members would no longer be able to earn rewards points at that hotel and generally would not be able to redeem already-earned rewards points at that hotel, even if a qualifying stay had been booked before the deflagging date.

**[\*7]** Petitioner created and controlled a Program manual detailing the procedures and requirements for TPHOs' participation in the Program, which was made available to employees of both petitioner and the TPHOs. Petitioner required that all Hyatt-branded hotels (including international hotels) participate in the Program and did not allow TPHOs to request refunds of payments made to the Fund.[9] Petitioner also required that all Hyatt-branded hotels allocate a certain percentage of total room inventory for potential redemptions by Program members. Similarly, the Program manual stated that there were no blackout dates for rewards stays booked by Program members, though the TPHOs could request that the percentage of rooms reserved for Program members be reduced during limited high demand periods, subject to petitioner's approval.

Petitioner's primary communication to the managed hotels about the Program was via system services disclosures included in their annual business plans for each managed hotel. Over time, petitioner changed the terms in the system services disclosures relating to the Program, including a change in 2011 to specify that the assessment fee charged to the hotel owners would be determined by Hyatt in its discretion. Petitioner did not seek approval from the TPHOs for this change.

Some older management agreements still in place during the years at issue (most obviously agreements that predated 1987) did not refer to the Program or the Fund. The management and franchise agreements that did refer to the Program characterized it as a mandatory service. The management and franchise agreements that referred to the Fund had a clause generally describing how the Fund was invested and what costs it was used to cover. Petitioner sometimes entered into specific service agreements governing the participation in the Program (as well as participation in other chainwide services provided by petitioner) of TPHOs operating Hyatt-branded hotels internationally.

A. *The Fund*

Operating the Program involved a regular inflow and outflow of payments between petitioner and the various owners of the Hyatt-branded hotels. When a Program member opted to receive rewards

---

[9] Hyatt subsidiaries that owned Hyatt-branded hotels also participated in the Program, making payments into the Fund and receiving compensation payments.

[*8] points earned from a stay at a Hyatt-branded hotel, the hotel owner would pay petitioner an assessment fee of four percent of the revenue derived from that member's stay (4% payments). In 2011 petitioner determined to increase the assessment fee to 4.5% for full service Hyatt-branded hotels, effective January 1, 2012. Petitioner intended for this change to result in having a higher amount of the Fund available to pay for Program advertising. When a Program member alternatively opted to receive travel miles instead of rewards points, the hotel owner would pay petitioner the actual cost of the miles (miles payments), as negotiated and agreed to in the contracts between petitioner and the third-party transportation partners. The 4% payments and the miles payments were calculated and paid out to petitioner monthly, flowing into a pair of bank accounts owned and operated by petitioner.[10] Petitioner also sold rewards points directly to customers, hotel owners, certain car rental companies, and to Hyatt Vacation Club (its timeshare business). The proceeds of these sales (sale payments) were also deposited into the same bank accounts owned and operated by petitioner. Petitioner described the balance of the 4% payments, miles payments, and sales payments (collectively, Program payments), once received, as the Fund.

Petitioner entered into agreements with several third-party custodians to hold portions of the Fund; petitioner also entered into agreements with several third-party investment advisers to invest portions of the Fund.[11] Petitioner directed the general investment strategy of the Fund, which was largely invested in marketable, fixed income securities. The TPHOs did not have any input or control over the choice of investment advisers or the Fund's investment strategy. During the years at issue the Fund accrued interest and realized gains from investments. Petitioner received quarterly statements from its custodians displaying the securities held and transactions made during the previous quarter. Aside from annual Fund financial statements provided by petitioner (discussed further below), the TPHOs did not regularly receive communications about the performance of the Fund investments.

---

[10] These bank accounts were used only for Program payments, not general corporate cash.

[11] The agreements with the custodians and investment advisers represented that the client was "Hyatt Corporation, As Agent for the Hotels Owned, Leased, Operated, Managed, or Franchised By It, Its Subsidiaries, and/or Affiliates, d/b/a Hyatt Gold Passport."

**[\*9]**    When a Program member redeemed rewards points at a Hyatt-branded hotel, petitioner would pay a compensation payment to the hotel owner out of the Fund.[12]  Petitioner based the amount of the compensation payment on two factors: the hotel's occupancy rate during the award stay and the hotel's forecasted monthly average rate (FMAR) for rooms.[13]  As of January 2009, compensation payments were calculated via a multitier compensation structure depending on occupancy rate.  If hotel occupancy during the award stay was nearly full (as measured by a particular percentage threshold), the hotel owner would receive compensation in an amount equal to a significant portion of the FMAR (compensation level A).  If hotel occupancy during the award stay was not near to full, the hotel owner would receive compensation equal to only a small portion of the FMAR.

Effective January 1, 2011, petitioner changed the formula for compensation payments, which resulted in decreased annual amounts of compensation payments made and thus had the effect of increasing the amount of the Fund available for use by petitioner.[14]  The TPHOs did not have any control over the formula for the compensation payments.

In addition to operating the Fund as a reserve for the compensation payments, petitioner used the Fund to pay advertising and administrative costs that it designated as related to operating the Program.  The administrative costs of the Program included (1) costs of maintaining member call centers and contact centers; (2) the salaries and benefits of employees involved in operating the Program;[15] and (3) the cost of maintaining the Program's member database.  The member database, which had been in existence since 1987 and was managed by a third-party vendor, recorded extensive information related to individual members and their stays at Hyatt-branded hotels and

---

[12] In reality, compensation payments would often be recorded as a credit setoff against the amount of Program payments due to petitioner in monthly invoices.

[13] Every January, each Hyatt-branded hotel would submit its FMARs for the coming calendar year, subject to adjustment by petitioner.

[14] The change petitioner made in 2010, which reclassified the hotels in award categories and added a new award category, resulted in decreased annual amounts of compensation payments made to hotel owners and thus had the effect of increasing the amount of the Fund available for use.

[15] For certain employees that presumably spent only part of their time on Program-related activities, only a portion of their salaries and benefits would be designated as Program expenses.

**[\*10]** maintained members' rewards points balances. With regard to individual members, the database would record information useful for tailoring future stays to a member's preferences. For instance, if a member had demonstrated a preference for a particular beverage or type of pillow, the member database could record that observation for use in future stays. Petitioner's marketing department also used the member database to generate macro-level analytics about Hyatt customers, which were then incorporated into targeted advertising of particular customer demographics. Petitioner owned the member database and considered it to be highly valuable in its business. The TPHOs did not have any ownership interest in the database, nor did they have access to the entirety of the member database; to access the narrow slice of membership data related to stays at the particular TPHO-owned hotel, a TPHO could request permission from petitioner. If a TPHO deflagged from the Hyatt brand, it would not receive a copy of the data from the member database.[16] Some of the administrative costs paid by petitioner out of the Fund were made to other Hyatt entities to reimburse them for expenses that were paid "for the benefit of the Program."

As part of preparing annual budgets, Hyatt personnel determined approximately how much of the Fund would be spent on administrative costs and advertising in a given year upon the basis of projected Fund balance in excess of an actuarial estimated reserve amount designated to cover future compensation payments (discussed further below). Hyatt personnel involved in the Program would designate particular expenses as Program related and contact petitioner's treasury department to make a corresponding disbursement from the Fund.[17] The TPHOs did not have any control on how the Fund was spent on administrative costs or advertising.

If a TPHO deflagged from the Hyatt brand, that TPHO was not entitled to any payment or reimbursement out of the Fund. Instead, the proportionate amount of the Fund attributable to the deflagging TPHO would remain available for making compensation payments or satisfying administrative or advertising expenses.

---

[16] The management and franchise agreements typically included a clause that defined Program member information as confidential or proprietary (except to the extent that a TPHO itself lawfully stored information in its own property management database) and thus not usable by a TPHO upon expiration of an agreement's duration.

[17] If a particular expense was of a sufficiently high dollar amount, approval by a more senior executive was required prior to disbursement.

**[\*11]** B.    *Program Advertising*

Hyatt personnel determined how much would be spent on Program advertising for a given year.  Internal analysis by petitioner during the years at issue indicated that every $1 spent on Program advertising generated a return on investment of $8 in revenue.  As noted above, in 2011 petitioner increased the number of rewards points to be redeemed for a stay at certain Hyatt-branded hotels.  Petitioner intended for this change to free up additional amounts of the Fund to spend on Program advertising that would otherwise have been earmarked to cover future rewards points redemptions.  Hyatt personnel also determined whether the costs of a particular advertisement should be borne by the Fund.  In making such determinations, members of petitioner's marketing department involved in the Program would sometimes consult with members of petitioner's finance and legal departments.  Sometimes Hyatt personnel would determine that only a portion of the costs of a particular advertisement should be paid by the Fund.  The TPHOs did not have any control over how petitioner spent the Fund on Program advertising.

A common example of Program advertising was sending membership offer letters to customers of credit cards or airlines with whom petitioner had partnered.  For instance, one typical promotional joint advertisement with Mastercard had the following tagline: "There Are Thousands of Reasons to Stay at Hyatt.  And Now Every Stay Comes With 2,500 More."  Some Program advertising was primarily branded with the Program's own logo (the trademark of which was owned by petitioner), while other advertising was primarily branded with Hyatt's own logo. Other Program advertising gave equal prominence to both the Program and Hyatt logos.  Program advertising also sometimes displayed the logos of specific Hyatt sub-brands.  Online or emailed Program advertising typically included a link for customers to book a stay on Hyatt's website.

IV.    *Financial Accounting and Reporting*

A.    *Fund Actuarial Analyses*

A third-party accounting firm, PricewaterhouseCoopers (PWC), prepared regular actuarial analyses of the Fund in order to determine the amount necessary to cover future potential redemptions by Program members.  On the basis, in part, of the Program's past rewards points redemption rates, PWC would estimate the number of rewards points

[*12] that would be redeemed and determine a range of dollar amounts that should be held in reserve for anticipated future redemptions. As part of the actuarial analyses, PWC would also estimate the rate of "breakage," i.e., the numbers of rewards points that would never be redeemed and thus never require a compensation payment out of the Fund.

B.     *Fund Financial Statements*

Annual financial statements were prepared for the Fund (Fund statements) in accordance with Generally Accepted Accounting Principles (GAAP). A third-party accounting firm, Deloitte, audited the Fund statements for the years at issue. The Fund statements included income statements, which reported as revenue the following amounts for the years at issue:

|  | *2009* | *2010* | *2011* |
|---|---|---|---|
| Program Payments | $63,168,430 | $77,195,168 | $103,383,532 |
| Marketable Securities – Net Gain | 7,214,521 | 7,510,716 | 7,208,255 |
| Interest Income | 12,026,344 | 10,516,012 | 8,281,521 |
| **Total Income** | **$82,409,295** | **$95,221,896** | **$118,873,308** |

The income statements reported expenses in a category entitled "Provision for future award redemptions" in the following amounts: 2009: $38,131,732; 2010: $54,530,389; and 2011: $72,522,615.

The income statements also reported the remaining amounts of costs and expenses:

| [*13] | 2009 | 2010 | 2011 |
|---|---|---|---|
| Advertising | $21,165,826 | $16,251,855 | $10,620,650 |
| Membership Acquisition & Enrollment/Fulfillment | 3,679,263 | 4,749,127 | 13,607,160 |
| Membership Communication & Marketing | — | — | 7,121,477 |
| Membership Statements & Processing | 1,673,285 | 1,137,967 | — |
| Call Center | — | — | 6,806,864 |
| General & Administrative | 17,763,862 | 18,555,852 | 8,195,723 |

The expense for the provision for future rewards points redemptions was the largest expense on the income statements, ranging from 46% to 61% of the total Fund expenses. For each of the years at issue, the income statements reported a small dollar net loss. The Fund statements also included balance sheets, which reported as liabilities a reserve for the future rewards points redemptions, chosen from within PWC's actuarial range.

The Fund statements made a number of representations and disclosures concerning the Program and the Fund. The Fund statements represented that petitioner used the Fund to cover the cost of the administrative expenses of operating the Program, such as employee salaries and benefits, rent, and office management expenses. The Fund statements described the Fund as being owned by the Hyatt-branded hotel owners during the period in which they participated in the Program. The Fund statements also addressed income taxes, which they described as being an obligation of each Hyatt-branded hotel owner. The Fund statements were made available to TPHOs annually.

**[*14]** C.    *Petitioner's Form 10–K Financial Statements*

Petitioner filed Form 10–K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, with the Securities and Exchange Commission for 2009, 2010, and 2011 that included consolidated financial statements prepared in accordance with GAAP. Petitioner's Forms 10–K included the following footnote in relevant part:

> The Hyatt Gold Passport Program (the "Program") is our loyalty program. We operate the Program for the benefit of Hyatt branded properties, whether owned, operated, managed, or franchised by us. The Program is operated through the Hyatt Gold Passport Fund, which is an entity that is owned collectively by the owners of Hyatt branded properties, whether owned, operated, managed or franchised by us. The Hyatt Gold Passport Fund (the "Fund") has been established to provide for the payment of operating expenses and redemptions of member awards associated with the Program. The Fund is maintained and managed by us on behalf of and for the benefit of Hyatt branded properties. We have evaluated our investment in the Fund and have determined that the Fund qualifies as a variable interest entity ("VIE") and, as a result of the Company being the primary beneficiary, we have consolidated the Fund.

On its Form 10–K balance sheets, petitioner consolidated the total amounts of assets and liabilities that constituted the Fund. The Forms 10–K did not separately present the Fund assets and liabilities. On its Form 10–K balance sheets, petitioner included the cash portion of the Fund in the consolidated amounts reported for "Cash and cash equivalents" rather than the line for "Restricted cash."[18] On its Forms 10–K income statements, petitioner also consolidated the Fund's annual income and expense activity, after making certain adjustments and eliminations for intercompany transactions. On its income statements, petitioner reported a line item, entitled "Net gains (losses) and interest income from marketable securities held to fund operating programs," a category which included the investment gains and interest attributable to the Fund.

---

[18] The amount of cash associated with the Fund was not separately stated or disclosed on the Forms 10–K.

**[\*15]** Deloitte audited petitioner's financial statements for 2009, 2010, and 2011 and issued unqualified opinions that the financial statements presented petitioner's financial position fairly and were materially correct. In corresponding audit memoranda, Deloitte personnel noted that the Fund redemption liability was the largest liability on petitioner's balance sheet and described its valuation as an audit risk.

### D.     *Hotel Owners' Financial Statements*

For some of the managed TPHO-owned hotels, petitioner would prepare annual financial statements for the hotel as part of its management services. Petitioner did not prepare annual financial statements for any of the franchised TPHO-owned hotels. The income statements in the financial statements petitioner prepared for managed hotels reported the 4% payments made by the particular TPHO as expenses.

## V.     *Tax Reporting*

Petitioner filed consolidated Form 1120, U.S. Corporation Income Tax Return, for each of the years at issue. Petitioner reported the Fund's assets and liabilities in the totals reported on its Schedules L, Balance Sheets per Books. However, petitioner did not include the total annual amounts of Program revenue[19] in gross income or claim deductions with respect to the total annual amounts of Program expenses.[20] In its capacity as hotel owner, petitioner included in gross income the amounts of compensation payments that it was paid or was due from the Fund for the years at issue. Petitioner's Forms 1120 did not purport to use the trading stamp method or include any statements with respect to Treasury Regulation § 1.451-4.

In order to prepare its Schedules M–3, Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More, petitioner's accounting personnel proportionally allocated the Fund rewards points redemption reserve to each domestic hotel.[21] The

---

[19] Program revenue is the sum of the Program payments received, the interest accrued, and investment gains realized on the Fund during the years at issue.

[20] On petitioner's 2009 consolidated Form 1120, a small amount of Program revenue and Program expenses (which netted to zero) was accidentally included in gross income and claimed as deductions by petitioner because of a clerical error.

[21] Petitioner's accounting personnel first removed from the total the amount of the reserve allocable to the international hotels.

**[*16]** allocation was intended to result in the estimated total amount of 4% and miles payments made by each domestic hotel that had not yet been paid out by the Fund as compensation payments (i.e., the amounts not yet satisfying the economic performance requirement for deductibility). To allocate the reserve, petitioner's accounting personnel would first calculate a weighted average, by dividing each hotel's net life-to-date amount of Program payments and compensation payments by the net life-to-date amount of Program payments and compensation payments made by all currently participating hotels. Each hotel's weighted average percentage would then be applied to the yearend rewards points redemption reserve, resulting in each hotel's allocated share. Next, petitioner's accounting personnel would compare the hotel's prior year allocated share to the current year allocated share. If there was a year-over-year increase in the hotel's allocated share (i.e., more Program payments coming into the Fund than going out), petitioner's accounting personnel would determine to record a downward adjustment to the hotel's Program expense deduction in the amount of the increase for federal income tax purposes. Conversely, if there was a year-to-year decrease in the hotel's allocated share, petitioner's accounting personnel would determine to record an upward adjustment to the hotel's Program expense deduction. Pursuant to the allocations with respect to the Hyatt-owned hotels, petitioner made adjustments on its Schedules M–3 to the Fund rewards points reserve book expense.[22]

During each of the years at issue petitioner issued standardized letters to all of the domestic TPHOs. The letters described the structure of the Program and the Fund and reported to each TPHO that owned a managed hotel the dollar amount of Program payments made by the TPHO in that year that related to future year compensation payments. The letters recommended that the TPHOs consult their tax advisers to decide how to treat the amounts for federal income tax purposes. Petitioner's personnel considered the amounts described in the letters to be the portion of each TPHO-owned hotel's allocated expenses that would not be currently deductible for federal income tax purposes because not yet paid out (i.e., not yet meeting the economic performance requirement for deductibility).

In sum, with respect to the Program revenue and expenses, petitioner thus took the tax position that it operated in two distinct

---

[22] This again reflected the position that the economic performance requirement was not met until payments were actually made out of the Fund.

[*17] capacities. In its role as "agent" for the hotel owners, petitioner consistently did not include any Program revenue in gross income or claim any deductions with respect to Program expenses. In its role as owner of 20%–25% of the hotels, petitioner claimed deductions for its (Schedule M–3 adjusted) share of Program expenses, for the tax year in which compensation payments were made out of the Fund. Similarly, in its role as owner of 20%–25% of the hotels, petitioner included in gross income the compensation payments made to it out of the Fund.

In contrast, during the years at issue a substantial majority of the domestic TPHOs deducted the 4% payments they made under the Program on their federal income tax returns for the year they made the payments into the Fund. Accordingly, those TPHOs' returns reflected the contrary position that economic performance had been satisfied with respect to the 4% payments upon payment to petitioner. Petitioner did not prepare federal income tax returns for any of the TPHOs during the years at issue.

VI.    *The Notice of Deficiency and the Petition*

Respondent conducted an examination of petitioner's returns for the 2009, 2010, and 2011 tax years. On March 22, 2017, respondent issued to petitioner a notice of deficiency, which made the following determinations:

| Tax Year | Deficiency (Overpayment) |
|---|---|
| 2005 | $72,058,943 |
| 2008 | 3,227,772 |
| 2009 | 0 |
| 2010 | (4,230,046) |
| 2011 | 0 |

The deficiency amounts reflected respondent's determination that the Program revenue (net of deductible Program expenses paid out of

[*18] the Fund) was includible in petitioner's income in the following amounts:

| Year | Amount |
|------|--------|
| 2009 | $222,559,183 |
| 2010 | (3,440,170) |
| 2011 | 20,962,322 |

For each year, respondent determined the amount of Program revenue by subtracting petitioner's allocated share of the future rewards points redemption liability (in its role as hotel owner) from the year-over-year total increase or decrease in the amount of the estimated future rewards points redemption liability. Put more simply, respondent essentially used the increase or decrease in amount of the redemption reserve as a proxy for the amount by which the Program revenue exceeded or was exceeded by deductible Program expenses for a given year.

Tax year 2009 reflected a transitional adjustment of $228,017,823 made by respondent under section 481(a) to account for amounts of Program revenue (net of Program expenses paid out of the Fund) that were not included in petitioner's taxable income for tax years 1987 through 2004. As a result of the Program revenue determinations, respondent adjusted the carryback of a net operating loss applied by petitioner from tax year 2009 to 2005, which resulted in a deficiency for tax year 2005. Similarly, as a result of the Program revenue determinations, respondent adjusted the carryback of amounts of allowable foreign tax credit and general business credit, which resulted in a deficiency for tax year 2008. Ultimately, the section 481 adjustment was the source of most of the determined deficiency.

On June 20, 2017, petitioner timely filed a Petition with this Court.

19

                     OPINION

I.      *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Pittman v. Commissioner*, 100 F.3d 1308, 1313 (7th Cir. 1996), *aff'g* T.C. Memo. 1995-243. For this presumption to adhere in cases involving receipt of unreported income, the Commissioner generally must make a minimal evidentiary showing connecting the taxpayer with the income-producing activity or demonstrating that the taxpayer actually received unreported income. *See Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). We conclude that respondent has made the requisite showing to shift the burden to petitioner.

II.      *Inclusion of Program Revenue in Gross Income*

Section 61 broadly defines gross income as "all income from whatever source derived." We narrowly construe any exclusions from this sweeping definition. *See Commissioner v. Schleier*, 515 U.S. 323, 328 (1995). Receipt and possession of property "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *James v. United States*, 366 U.S. 213, 219 (1961) (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)); *see Burnet v. Wells*, 289 U.S. 670, 678 (1933) ("Liability may rest upon the enjoyment by the taxpayer of privileges and benefits so substantial and important as to make it reasonable and just to deal with him as if he were the owner, and to tax him on that basis."); *Corliss v. Bowers*, 281 U.S. 376, 378 (1930) ("[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."); *see also Rogers v. Commissioner*, T.C. Memo. 2011-277, 102 T.C.M. (CCH) 536, 538 ("The economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is income."), *aff'd*, 728 F.3d 673 (7th Cir. 2013). "The mere fact that income received by a taxpayer may have to be returned at some later time does not deprive it of its character as taxable income when received . . . ." *Nordberg v. Commissioner*, 79 T.C. 655, 665 (1982) (quoting *Woolard v. Commissioner*, 47 T.C. 274, 279 (1966)), *aff'd*, 720 F.2d 658 (1st Cir. 1983); *see Healy v. Commissioner*, 345 U.S. 278, 282–83 (1953) (observing that a later year judicial declaration of constructive trust on

**[\*20]** funds cannot retroactively render funds nontaxable for year received, when taxpayer initially had control and economic benefit); *Ill. Power Co. v. Commissioner*, 792 F.2d 683, 689 (7th Cir. 1986) ("Where, unlike the case of a trustee or a collection agent or a borrower, the taxpayer's obligation to refund or rebate or otherwise repay money that he has received is contingent, the money is taxable as income to him."), *aff'g in part, rev'g in part* 83 T.C. 842 (1984). Conversely, courts have long recognized that "a cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not to throw the burden upon a mere collector or conduit through whom or which the income passes." *Cent. Life Assur. Soc., Mut. v. Commissioner*, 51 F.2d 939, 941 (8th Cir. 1931), *rev'g* 18 B.T.A. 667 (1930); *see Pascarelli v. Commissioner*, 55 T.C. 1082, 1091 (1971) (observing that transferor's retention of dominion and control over transferred funds would suggest that transferee "acted merely as a conduit" and "not as the beneficial owner"), *aff'd*, 485 F.2d 681 (3d Cir. 1973).

In *Seven-Up Co. v. Commissioner*, 14 T.C. 965, 979 (1950), this Court recognized a particular exclusion from gross income, which has come to be known as the trust fund doctrine. There, the taxpayer created and maintained a collective fund for the purpose of paying for national advertising of its signature soft drink beverage. *Id.* at 968–71. Some third-party bottlers of the 7-Up beverage, who regularly purchased 7-Up extract from the taxpayer, voluntarily contributed into the fund, which was then used to pay for national radio and magazine advertising. *Id.* at 970–71. The question before this Court was whether the payments into the fund were includible in the taxpayer's gross income. *Id.* at 976. We characterized the payments made by the bottlers as neither "for services rendered or to be rendered" by the taxpayer nor "part of the purchase price of the extract." *Id.* at 977. We concluded that the payments were not includible in gross income, reasoning that the taxpayer did not gain or profit because of the fully offsetting restriction on its use of the fund. *Id.* at 979.

Since *Seven-Up Co.*, this Court has refined the applicable legal test, which now holds that when a taxpayer (1) receives funds in trust, subject to a legally enforceable restriction that they be spent in their entirety for a specific purpose and (2) does not profit, gain, or benefit from spending the funds for that purpose, then the taxpayer may exclude such funds from gross income. *See Ford Dealers Advert. Fund, Inc., Jacksonville Div. v. Commissioner*, 55 T.C. 761, 771 (1971), *aff'd*, 456 F.2d 255 (5th Cir. 1972). When both elements of the trust fund

**[\*21]** doctrine are present, the taxpayer is deemed to be a mere conduit or custodian of funds and not the beneficial owner for federal income tax purposes. *See Florists' Transworld Delivery Ass'n v. Commissioner*, 67 T.C. 333, 345–47 (1976); *N.Y. State Ass'n of Real Est. Bds. Grp. Ins. Fund v. Commissioner* (*NYS Ass'n*), 54 T.C. 1325, 1335 (1970); *Dri-Powr Distribs. Ass'n Tr. v. Commissioner*, 54 T.C. 460, 478–79 (1970); *Broad. Measurement Bureau, Inc. v. Commissioner*, 16 T.C. 988, 1001 (1951); *see also Affiliated Foods, Inc. v. Commissioner*, 154 F.3d 527, 532–33 (5th Cir. 1998), *aff'g in part, rev'g in relevant part and remanding* T.C. Memo. 1996-505. In applying the trust fund doctrine, we also draw upon the reasoning of older precedents, particularly a line of cases involving payments made by cemetery lot customers to cemetery associations for perpetual care or capital improvements. *See, e.g., Commissioner v. Cedar Park Cemetery Ass'n*, 183 F.2d 553, 556–57 (7th Cir. 1950), *aff'g* 8 T.C.M. (CCH) 177 (1949); *Portland Cremation Ass'n v. Commissioner*, 31 F.2d 843, 845–46 (9th Cir. 1929), *rev'g* 10 B.T.A. 65 (1928); *Am. Cemetery Co. v. United States*, 28 F.2d 918, 919 (D. Kan. 1928).

The parties dispute whether the Program revenue paid or due to petitioner was properly excluded from petitioner's gross income pursuant to the trust fund doctrine. Petitioner contends that it was legally restricted in its use of the Fund by (1) the applicable management and franchise agreements, (2) a course of dealing between it and the TPHOs, and (3) fiduciary duties arising by way of an agency relationship between it and the TPHOs. Petitioner further contends that it did not directly benefit from its use of Fund. Respondent asserts in turn that petitioner's use of the Fund was not so restricted and that petitioner directly benefited from the Fund.

Petitioner also contends, in what it characterizes as an alternative argument, that it is entitled to exclude the Program revenue from gross income under the claim of right doctrine. *See N. Am. Oil Consol. v. Burnet*, 286 U.S. 417, 424 (1932) ("If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income . . . ."); *Bates Motor Transp. Lines, Inc. v. Commissioner*, 200 F.2d 20, 24 (7th Cir. 1952), *aff'g* 17 T.C. 151 (1951); *Diamond v. Commissioner*, 56 T.C. 530, 541–42 (1971), *aff'd*, 492 F.2d 286 (7th Cir. 1974). We do not understand that doctrine to provide an independent basis for exclusion of the Program revenue in these circumstances. The trust fund doctrine is best understood as a more tailored application of claim of right principles; if a taxpayer holds funds in trust subject to a use restriction and for the primary benefit of others, it naturally follows that such funds are not "received and treated by a

[*22] taxpayer as belonging to [it]"—i.e., without a claim of right. *See Healy v. Commissioner*, 345 U.S. at 282; *see also Seven-Up Co.*, 14 T.C. at 977 (observing that payments into trust fund were not "earnings received by [the taxpayer] under a claim of right and without restriction as to disposition"); *Na v. Commissioner*, T.C. Memo. 2015-21, at *21–22 (characterizing *Seven-Up Co.* as an application of the claim of right doctrine). We thus analyze the parties' contentions under the more apt framework of the trust fund doctrine.

Turning back to that doctrine, we start (and ultimately end) our inquiry in reverse order, by first reviewing the nature of the benefit to petitioner from the Fund. Accordingly, first assuming arguendo that the Fund was received in trust subject to a legally enforceable restriction, "our task is to determine whether the economic benefit to [petitioner] as trustee is such that [petitioner] should be taxable on receipt of the payments, notwithstanding whatever power the [TPHOs] may have to enforce the trust terms under state law." *Angelus Funeral Home v. Commissioner*, 407 F.2d 210, 212 (9th Cir. 1969) (citing *Gracelawn Mem'l Park, Inc. v. United States*, 260 F.2d 328, 332 (3d Cir. 1958) (assuming that valid trust fund existed but concluding that funds were "readily available to promote future capital improvements in the taxpayer's property" and thus includible in gross income)), *aff'g* 47 T.C. 391 (1967); *see Nat'l Mem'l Park, Inc. v. Commissioner*, 145 F.2d 1008, 1013 (4th Cir. 1944) (concluding that, even if fund had been shown to be a valid trust fund, it would be includible in gross income because "the benefit of the fund inured primarily to the [taxpayer]").

Under the trust fund doctrine, any benefit inuring to the taxpayer from use of a purported trust fund cannot be more than "incidental and secondary." *See Angelus Funeral Home*, 47 T.C. at 396, 398 (concluding that taxpayer's contractual option to use a purported trust fund to pay for capital improvements to its facilities or to acquire real estate was "of sole benefit to the [taxpayer] and of no conceivable benefit to the [the trust fund contributors])"); *Na*, T.C. Memo. 2015-21, at *43 (citing *Pierson v. Commissioner*, T.C. Memo. 1976-281, 35 T.C.M. (CCH) 1256, 1259, 1261) (characterizing benefit to taxpayer from use of funds as "incidental" when spent only to facilitate her perceived duty to her employer). "If a purported trustee has the right to use the funds for his own benefit—even if that right is limited—no trust exists, and the funds are includible in gross income." *Berry v. Commissioner*, T.C. Memo. 2021-42, at *11 (citing *Angelus Funeral Home*, 47 T.C. at 398); *see Na*, T.C. Memo. 2015-21, at *24 ("[I]f a taxpayer receives and disburses funds strictly as an intermediary for transactions between other parties

**[\*23]** and receives no material benefit from the funds, the taxpayer need not include the funds in [its] gross income."). For instance, if a taxpayer's use of the purported trust fund directly increases the value of its property, the trust fund doctrine is typically inapplicable. *See, e.g.*, *United States v. Md. Jockey Club of Balt. City*, 210 F.2d 367, 371 (4th Cir. 1954) (holding that portion of horse race betting receipts set aside in fund by taxpayer pursuant to state law were includible its gross income when usable by taxpayer for capital improvements at its racetrack). To illustrate, we borrow a (somewhat fitting) older hypothetical:

> If, upon the completion of an hotel, its directors created a trust requiring twenty per cent of the proceeds of the rentals from all rooms to be placed in trust for the purchase of land for the building of a golf course, tennis courts and swimming pool and providing that all fees exacted from guests for the use of these facilities be paid into the trust but that, upon the final payment for such facilities, they be deeded to the hotel corporation in trust forever, could it be reasonably argued that, although for the use and benefit of hotel guests, the hotel corporation did not also benefit?

*Gracelawn Mem'l Park, Inc. v. United States*, 157 F. Supp. 516, 519–20 (D. Del. 1957) (holding that contributions to capital improvement fund held by taxpayer-cemetery association were includible in taxpayer's gross income), *aff'd*, 260 F.2d 328 (3d Cir. 1958). In the hypothetical, the fees paid by hotel guests would still constitute income to the hotel, because its use of the fees directly enhanced the value of its property, rather than incidentally doing so as a byproduct of benefiting the hotel guests. *See id.*; *cf. Angelus Funeral Home v. Commissioner*, 407 F.2d at 212–13 (distinguishing between "incidental benefit" to taxpayer of simply holding use-restricted funds and the direct benefit of using funds to improve property); *Gracelawn Mem'l Park, Inc.*, 260 F.2d at 332 (observing that taxpayer's spending of purported trust fund on capital improvements might be "convenient" or "more desirable" for customers but that such spending was "for the corporation's benefit"). In determining the nature of the economic benefit to petitioner, our inquiry is thus a practical one. *See James*, 366 U.S. at 219 (framing question as whether taxpayer's control over funds resulted in economic value "as a practical matter"); *Chi., R.I. & P. Ry. Co. v. Commissioner*, 47 F.2d 990, 992 (7th Cir. 1931), *rev'g* 13 B.T.A. 988 (1928); *Knowland v. Commissioner*, 29 B.T.A. 618, 624 (1933); *see also Mount Vernon Gardens, Inc. v. Commissioner*, 298 F.2d 712, 716 (6th Cir. 1962) ("The

**[\*24]** questions of control by, and inurement to the benefit of, the taxpayer, are of prime importance."), *aff'g in relevant part, rev'g and remanding* 34 T.C. 598 (1960).

Respondent identifies several ways in which petitioner primarily benefited from the Fund and asserts that the Program revenue was thus includible in petitioner's gross income. Ultimately, we agree with respondent. We find that petitioner mandated that the TPHOs participate in the Program and pay into the Fund, controlled the amounts of Program payments in and compensation payments out of the Fund, decided how to invest the Fund, accrued interest and realized investment gains from holding the Fund, and determined whether particular advertising or administrative costs would be paid for by the Fund—all without oversight or input from the TPHOs. In turn we find that petitioner benefited in a number of ways from how it exercised its control over the Program and Fund. On the basis of these findings, we conclude that petitioner had a sufficient beneficial economic interest and thus should have included the Program revenue in gross income for the years at issue. To illustrate the benefit to petitioner, we examine the interplay of the various features of the Program and the Fund.

First, we find significant that petitioner controlled the up-front amounts of 4% payments, miles payments, and sales payments, the former two of which were mandatory for all TPHOs when a Program member made a qualifying stay. With respect to the 4% payments, petitioner exercised its control when it required full service hotel owners to make larger 4% payments in 2011. That change increased the size of the Fund available to petitioner and decreased the TPHOs' profit margins. The TPHOs could not prevent this change. Similarly, with respect to the miles payments, petitioner directly negotiated agreements with third-party transportation partners and then obligated hotel owners to make reimbursing miles payments into the Fund when a hotel guest chose to receive miles. Again, the TPHOs did not have input into the choice of third-party transportation partners, the negotiated costs of miles, or the number of miles received by customers for a stay.

Once the 4% payments, miles payments, and sales payments were constituted as the Fund, petitioner had significant control and discretion over spending. Petitioner controlled the investment of the Fund, engaging custodians and investment advisers of its choice and dictating the investment strategy and amounts to be invested—again without oversight or input by the TPHOs. In turn any accrued interest or

**[\*25]** realized gains from such investment remained within the control of petitioner as an addition to the Fund.

Petitioner also had the discretion to increase its spending from the Fund on whatever advertising and administrative costs it designated as associated with the Program.[23] The record is devoid of documentary evidence showing the specifics of how petitioner determined which "administrative costs" and "advertising" would be covered by the Fund.[24] Trial testimony by Messrs. Zidell and Stapp suggested that, at a high level, it was largely a matter of discretion by senior executives to designate particular costs as related to the Program, in consultation with other Hyatt personnel, and then allocate or disburse corresponding portions of the Fund. Petitioner's discretion to self-designate Program expenses in order to reimburse itself for advertising costs weighs against a conclusion that the trust fund doctrine is applicable. *See Sherwood Mem'l Gardens, Inc. v. Commissioner*, 350 F.2d 225, 230 (7th Cir. 1965) (focusing on taxpayer's "wide discretion in use" of purported trust fund and holding that the fund was includible in gross income), *aff'g* 42 T.C. 211 (1964); *Nat'l Mem'l Park, Inc. v. Commissioner*, 145 F.2d at 1012 (holding that purported trust fund receipts were includible in gross income where taxpayer had discretion as to what expenses would be paid "within the wide range of general construction and improvement"); *Memphis Mem'l Park v. Commissioner*, 28 B.T.A. 1037, 1043 (1933) (concluding purported trust fund receipts were includible in gross income where "the nature and extent" of the fund's spending "was entirely within the discretion" of the taxpayer), *aff'd*, 84 F.2d 1008 (6th Cir. 1936); *cf. Schochet v. Commissioner*, T.C. Memo. 1982-416, 44 T.C.M. (CCH) 556, 564 (finding that taxpayer-trustees lacked discretion and control over use of fund where they were required to spend fund as directed by advertising committee); *L.A. Cemetery Ass'n v. Commissioner*, 2 B.T.A. 495, 497 (1925) (holding that trust fund was excludable from gross income where taxpayer could "exercise no discretion in the accumulation or distribution of the fund" because of state law restrictions). In

---

[23] The only practical restraint on the amount of this spending arose from petitioner's decision to retain a reserve for future redemptions in an amount within PWC's range of actuarial estimates.

[24] At trial, Jeffrey Zidell, the former vice president of the Program division, did not testify to specifics of how petitioner calculated or ensured that such services were indeed provided at cost. Mr. Zidell suggested generally that the primary internal procedure was an annual budgetary process conducted by personnel involved in the Program and senior executives.

**[\*26]** contrast, the TPHOs did not have oversight over which costs were designated. *Cf. Affiliated Foods, Inc. v. Commissioner*, 154 F.3d at 532 (finding that co-op grocery store members chose which advertising promotions would be paid for out of trust fund); *Schochet*, 44 T.C.M. (CCH) at 560 (observing that advertising committee that directed spending of trust fund was made up equally of personnel from primary entity/franchisor and franchisees). Aside from access to the generalized Fund financial statements, which summarized expenses at a high categorical level, the TPHOs had no access to the details of what specific expenses were being paid out of the Fund. Accordingly, we find that petitioner essentially retained the right to reimburse itself out of the Fund at its own discretion. In total, petitioner controlled (1) the amounts of 4% payments, miles payments, and sales payments, (2) how (and how much of) the Fund was invested, and (3) the designation of expenses to be paid.[25] This significant control weighs in favor of the inference that petitioner had a beneficial interest in the Fund.

We now consider specifically how petitioner benefited from its control over the Fund. As noted above, we have previously encountered similar collective funds in the trust fund doctrine context. However, this case is unlike much of our other collective fund precedent in a key respect. In both this case and *Seven-Up Co.*, the entity holding the fund is the primary entity/franchisor itself or a subsidiary of that primary entity/franchisor, operating as a for-profit corporation. In similar collective fund precedents, the taxpayer was typically a separate entity, often a nonprofit, nonstock corporation or a formal trust, set up to hold the fund separately from the primary entity/franchisor's corporate structure. *See Ford Dealers Advert. Fund, Inc.*, 55 T.C. at 762 (nonstock corporation); *NYS Ass'n*, 54 T.C. at 1326 (trust); *Dri-Powr Distributors Ass'n Tr.*, 54 T.C. 462–63 (trust); *Schochet*, 44 T.C.M. (CCH) at 557 (trust); *Greater Pittsburgh Chrysler Dealers Ass'n of N. Pa. v. United States*, No. 76-218, 1977 WL 1100, at \*1 (W.D. Pa. Mar. 10, 1977) (nonstock corporation); *cf. Florists' Transworld Delivery Ass'n*, 67 T.C. at 334, 344 (applying trust fund doctrine to collective advertising fund held by parent membership organization organized as a nonstock

---

[25] Indeed, petitioner's own Forms 10-K implicitly disclosed that it maintained significant control over the Fund; by consolidating the Fund as a "variable interest entity," petitioner took the position that it had "[t]he power . . . to direct the activities of [the Fund] that most significantly impact the [Fund's] economic performance." Fin. Acct. Standards Bd., Statement of Fin. Acct. Standards No. 167, at 2 (June 2009), https://fasb.org/Page/ShowPdf?path=fas167.pdf (setting out the applicable financial accounting rules for when a reporting entity must consolidate another entity over which it does not hold a majority voting interest).

[*27] corporation). In such cases, the structure, by way of trust agreement provisions or a corporate charter or bylaws, precluded the primary entity/franchisor from exerting formal, legal control over the spending of the fund or directly profiting from use of the fund. *See Ford Dealers Adver. Fund, Inc.*, 55 T.C. at 762; *Schochet*, 44 T.C.M. (CCH) at 565.[26] Using a separate entity sidestepped the question of whether a primary entity/franchisor's possession and control of a fund itself might preclude a finding of a trust fund if it substantially benefited from its use. *See, e.g.*, Neal D. Borden et al., *Franchise Advertising Funds: Structural, Tax, Operational, and Liability Issues*, 10 Franchise L.J. 1, 37 (1990) ("[C]areful practitioners who are alert to the potential [tax] exposure with pooled advertising funds continue to be cautious, especially where no separate entity—a trust or nonstock corporation—exists.").

This structuring may also account for a key finding in *Seven-Up Co.* itself. There, the taxpayer was a true wholesaler; its business was selling extract to the bottlers, and it did not itself did sell any beverages directly to consumers. *Seven-Up Co.*, 14 T.C. at 966–67. We thus found that the increased revenue attributable to collective advertising flowed first to the various third-party bottlers that sold 7-Up to the advertised-to public, with a secondary "corresponding increase" then flowing to the taxpayer as the bottlers purchased increased amounts of extract to meet customer demand. *Id.* at 973. Accordingly, the taxpayer's revenue increased from the use of the collective advertising fund *only* if third party bottlers' sales increased first, and we ultimately concluded that the taxpayer did not directly gain or profit from receipt of the payments constituting the fund. *Id.* at 979.

With this backdrop, the uniqueness of petitioner's position vis-à-vis the Fund is clearer. During the years at issue, petitioner owned 20%–25% of the Hyatt-branded hotels and was the largest single owner of such hotels. Because of that role, having Program advertising paid for out of the Fund effectively shifted to the Fund the cost of at least some of the advertising that petitioner otherwise would have paid for to generate stays at its owned hotels—a direct benefit to petitioner. *See*

---

[26] To be sure, we found in several of these cases that the parent/franchisor was still somewhat involved as a practical matter. In *Ford Dealers Advertising Fund, Inc.*, 55 T.C. at 764, the parent/franchisor (Ford Motor Co.) initially collected fees from each sale to a car dealer of a Ford car before remitting the fees to the taxpayer for the advertising fund; in *Schochet*, 44 T.C.M. (CCH) at 557, the taxpayer, who was trustee of the advertising fund trust, was also the majority shareholder and an officer of the parent/franchisor.

**[\*28]** *Cato v. Commissioner*, 99 T.C. 633, 644 (1992) (concluding that entities were not mere conduits when receipt of funds relieved them of budgetary obligation to otherwise pay for services); *Lykes Energy, Inc. v. Commissioner*, T.C. Memo. 1999-77, 77 T.C.M. (CCH) 1535, 1538 (concluding that purported trust fund "served to shift the cost" of customer-driving subsidy from taxpayer to its customers); *see also Nat'l Mem'l Park, Inc. v. Commissioner*, 145 F.2d at 1013 (characterizing purported trust fund as serving "merely as a reimbursing fund to cover" taxpayer's spending on capital improvements that were "carried out without regard" to the fund's existence); *Memphis Mem'l Park*, 28 B.T.A. at 1041 (attributing significance to fact that taxpayer would have incurred same expenditures regardless of whether purported trust fund existed). In addition, increased revenue attributable to Program advertising flowed to petitioner directly when guests stayed at owned hotels. *See Lykes Energy, Inc.*, 77 T.C.M. (CCH) at 1538 (concluding that taxpayer's spending of purported trust fund increased its "rate base, number of customers, and sales"). Increased revenue would also flow to petitioner indirectly, through the gross-revenue-based management and royalty fees charged to the TPHOs. While these latter management and royalty fees resemble the secondary "corresponding increase" in *Seven-Up. Co.*, 14 T.C. at 973, the increased revenue to petitioner in its role as hotel owner is anomalous. This direct benefit weighs against a conclusion that petitioner did not have a beneficial interest in the Fund, particularly considering petitioner's control over the content of the Program advertising itself. We conclude that petitioner's receipt of and control over the Program advertising resulted in additional economic value to petitioner as a practical matter.

The Program advertising also directly benefited petitioner beyond the revenue from each individual hotel stay. As several of petitioner's witnesses explained, the long-term success of a chain hospitality business like petitioner's depends significantly upon maintaining and increasing the goodwill that customers associate with the Hyatt brand. *See Int'l Multifoods Corp. & Affiliated Cos. v. Commissioner*, 108 T.C. 25, 43–44 (1997) ("Goodwill is founded upon a continuous course of dealing that can be expected to continue indefinitely . . . [and] is the expectancy of continued patronage."); *Tele-Comms., Inc. & Subs. v. Commissioner*, 95 T.C. 495, 521 (1990), *aff'd*, 12 F.3d 1005 (10th Cir. 1993); *Watson v. Commissioner*, 35 T.C. 203, 213 (1960). As the owner of the Hyatt trademarks, petitioner directly benefited from the Program advertising, which included such trademarks and thus maintained and enhanced the value of petitioner's goodwill. *See Int'l Multifoods Corp.*, 108 T.C. at 42 ("[T]rademarks embody goodwill."); *H Grp. Holding, Inc.*

**[\*29]** *v. Commissioner*, T.C. Memo. 1999-334, 78 T.C.M. (CCH) 533, 560 (concluding that Hyatt brand name was valuable and "a drawing factor for potential customers" to Hyatt's international hotels); *Nestle Holdings, Inc. v. Commissioner*, T.C. Memo. 1995-441, 70 T.C.M. (CCH) 682, 696 ("Trademarks lose substantial value without adequate investment, management, marketing, advertising, and sales organization."), *vacated and remanded*, 152 F.3d 83 (2d Cir. 1998); *see also Coca-Cola Co. & Subs. v. Commissioner*, 155 T.C. 145, 241 (2020) (concluding that advertising of Coke products "enhanced the value" of Coke trademarks). Not only did customer goodwill generate repeat hotel stays and thus direct and indirect revenue for petitioner (as discussed above), but it also granted petitioner additional contractual leverage in its role as prospective franchisor or manager for hotel properties. Put another way, petitioner could rely on the increased goodwill associated with the Hyatt brand in negotiating higher royalties, management fees, and other fees in new agreements reached with existing or prospective TPHOs—a direct benefit to it. *See Mount Vernon Gardens, Inc. v. Commissioner*, 298 F.2d at 716 (characterizing taxpayer's use of purported trust fund to increase value of its unsold inventory as "direct benefit"); *Memphis Mem'l Park*, 28 B.T.A. at 1041 (concluding that purported trust fund of payments from cemetery lot customers was includible in gross income where taxpayer's use of fund to improve its property generated "a benefit through increased sales, at increased prices" of taxpayer's services to other cemetery lot customers); *see also Gracelawn Mem'l Park, Inc.*, 260 F.2d at 332 ("While a chapel [paid for by a purported trust fund] . . . is convenient for people who have burial rites to perform in bad weather, it is remembered that part of the income of [the taxpayer] comes from charges made for services in connection with burials.").

Intuitively, an increase in customer goodwill (and thus the value of a franchisor's intellectual property) does not ultimately accrue to the collective benefit of durational affiliates and franchisees like the TPHOs. *See Canterbury v. Commissioner*, 99 T.C. 223, 249 (1992) (concluding that McDonald's franchisee did not retain any goodwill "separate and apart from the goodwill inherent in the McDonald's franchise"); *Zorniger v. Commissioner*, 62 T.C. 435, 444–46 (1974); *Akers v. Commissioner*, 6 T.C. 693, 700 (1946); *see also Coca-Cola Co.*, 155 T.C. at 252 (concluding that value derived from advertising of Coke brands by affiliate exclusively belonged to taxpayer). A TPHO benefited from flying the Hyatt flag only for so long as it was entitled to do so pursuant to the duration of the applicable management or franchise agreement. If a TPHO continued on with the Hyatt brand, any increased goodwill

[*30] value would presumptively be accounted for in higher contract fees when the time for renewal of a management or franchise agreement came around. Alternatively, if a TPHO deflagged from the Hyatt brand, pursuant to the management or franchise agreement, the TPHO would not retain nor have any financial claim on the value of any goodwill generated from the Program advertising that it had partially funded. *See Montgomery Coca-Cola Bottling Co. v. United States*, 615 F.2d 1318, 1332 (Ct. Cl. 1980) ("Since goodwill is considered to be the value of the habit of customers to return to purchase a product at the same location, the absence of the product would destroy the value of the habit . . . ."); *cf. Akers*, 6 T.C. at 700 (characterizing General Motors franchise agreements as making no provision "for payments for good will or going-concern value in the event of their termination"). We conclude that petitioner's use of the Fund on Program advertising was a direct benefit to petitioner.

This same rationale holds true for other petitioner-owned intellectual property that the Fund paid for, namely the Program member database. Again, petitioner's witnesses characterized the Program member database as a key, valuable facet of petitioner's efforts to maintain and enhance customer goodwill. On the micro level, the member database recorded specifics about customer preferences that allowed hotel staff to tailor hotel stays to particular customers and thus encourage individualized brand loyalty and repeated future stays across the Hyatt chain. On the macro level, the aggregate customer analytics generated by the member database were highly useful to petitioner in its marketing efforts and decision making. The member database was owned and maintained by petitioner, and deflagging TPHOs were not entitled to retain the confidential data about members that visited its hotel. We conclude that petitioner's use of the Fund to generate and maintain customer goodwill primarily benefited itself, as opposed to the TPHOs.

Finally, we turn to petitioner's back-end control over the timing and amounts of compensation payments out of the Fund to hotel owners. Under the Program member terms and conditions, petitioner had the discretion to raise the bar for rewards points redemptions, make rewards points expirable, change the awards category for certain hotels, and create other conditions that would tend to increase the available balance of the Fund and decrease the amount and frequency of

[*31] compensation payments.[27] In 2010 petitioner exercised that discretion by raising the number of rewards points required for a stay at certain award categories of hotels. In 2011 petitioner also changed its formula for calculating compensation payments to the TPHOs. Each of these changes decreased the number of compensation payments going back out to the TPHOs and increased the amount of the Fund available for whatever petitioner designated as advertising and administrative costs. Petitioner's right to defer and decrease the compensation payments further demonstrates how it was ultimately able to control the Fund in order to primarily benefit itself.

To sum up, given the totality of petitioner's control and discretion over the Program and the Fund and how its use of the Fund directly benefited it, petitioner has failed to establish that the trust fund doctrine is applicable to it. We conclude that petitioner was more than just a mere intermediary or conduit, passively holding funds and then remitting them on for the convenience of others, with only an incidental benefit to itself. *Cf. Cent. Life Assur. Soc., Mut. v. Commissioner*, 51 F.2d at 941. Instead, petitioner had a sufficient beneficial economic interest in the Fund to be liable for tax. Given this conclusion, we need not address whether the Fund was received in trust subject to a use restriction that was legally enforceable by the TPHOs.[28] *See Angelus Funeral Home v. Commissioner*, 407 F.2d at 213 (assuming use restriction was enforceable but concluding that restriction allowed taxpayer "to benefit itself more than incidentally" and therefore did not preclude inclusion in gross income). We conclude that the trust fund doctrine exception is inapplicable and hold that petitioner must include the Program revenue in gross income.

---

[27] In 2012 petitioner did in fact change the Program to make rewards points expire after a certain period, which had the effect of reducing the number of future rewards points redemptions and thus compensation payments to TPHOs.

[28] We view petitioner's contentions on this point with some skepticism, given the record before us. *See Ill. Power Co. v. Commissioner*, 792 F.2d at 689 ("The underlying principle is that the taxpayer is allowed to exclude from his income money received under an *unequivocal* contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money." (Emphasis added.)). In any event, however, we think it prudent not to unnecessarily wade into the murky and unfamiliar waters of state law and equitable principles. *Cf. Jenkins v. Commissioner*, T.C. Memo. 2021-54, at *26.

**[\*32]** III. *Section 481 Adjustment*

Section 481(a) provides that, when a taxpayer computes its taxable income "under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, . . . there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted." Put more simply, if "income escapes taxation because of a change in the accounting method," the Commissioner is empowered under section 481(a) to "make an adjustment by including the omitted income in the year of the change." *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 570 (5th Cir. 1965). Section 481 remedies some of the practical problems posed by annualized tax accounting; for instance, "[b]ecause different tax accounting methods provide for different dates on which income or deductions are recognized, a switch in accounting methods can create a situation in which a taxpayer is able to deduct the same expense—or is required to recognize the same income—in two separate tax years." *Nat'l Life Ins. Co. & Subs. v. Commissioner*, 103 F.3d 5, 7 (2d Cir. 1996), *aff'g* 103 T.C. 615 (1994); *see Suzy's Zoo v. Commissioner*, 114 T.C. 1, 13 (2000), *aff'd*, 273 F.3d 875 (9th Cir. 2001); *Pursell v. Commissioner*, 38 T.C. 263, 269–71 (1962) (discussing purpose and legislative history of section 481), *aff'd*, 315 F.2d 629 (3d Cir. 1963).

The Commissioner's authority under section 481 is not limited by section 6501(a), which otherwise provides the general rule of limitations on his assessment authority. *See Graff Chevrolet Co.*, 343 F.2d at 572 ("Section 481 is designed to prevent a distortion of taxable income and a windfall to the taxpayer stemming from a change in accounting at a time when the statute of limitations bars reopening the taxpayer's returns for earlier years."); *see also Peoples Bank & Tr. Co. v. Commissioner*, 415 F.2d 1341, 1344 (7th Cir. 1969), *aff'g* 50 T.C. 750 (1968); *Superior Coach of Fla., Inc. v. Commissioner*, 80 T.C. 895, 912 (1983). However, this otherwise broad authority is bounded by the requirement that any adjustments to include omitted income be solely due to a change in the taxpayer's method of accounting. *See Rankin v. Commissioner*, 138 F.3d 1286, 1288 (9th Cir. 1998) ("[Section 481] adjustments are made *only* to compensate for the change in method of accounting."), *aff'g* T.C. Memo. 1996-350. Given the extraordinary authority posed by section 481, "we examine carefully each instance in which the Commissioner invokes" it. *Pinkston v. Commissioner*, T.C. Memo. 2020-44, at \*10–11.

**[\*33]** The parties dispute whether petitioner's treatment of the Fund constituted a method of accounting and thus whether the inclusion of Program revenue in gross income (and corresponding taking of deductions) constitutes a change in method of accounting subject to section 481 adjustment. As evinced by the parties' stipulations,[29] which we accept as binding admissions, *see* Rule 91(a) and (e), resolution of this issue is determinative of the bulk of the deficiency at issue in this case, which is otherwise time-barred from assessment.

To reiterate, a section 481 adjustment is permitted only if omitted or duplicated income is due solely to a change in the taxpayer's method of accounting. The phrase "change in method of accounting" is not expressly defined in the Code. The applicable regulation states that a "change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item." Treas. Reg. § 1.481-1(a)(1). The regulation then directs us to section 446(e) and Treasury Regulation § 1.446-1(e) for further rules as to what constitutes a change in method of accounting. *See* Treas. Reg. § 1.481-1(a)(1). Treasury Regulation § 1.446-1(e)(2)(ii)(*a*) defines a "material item" as "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." The regulation then inversely provides that "a change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." *Id.* subdiv. (ii)(*b*).

In determining whether a taxpayer's treatment constitutes a material item, we apply the lifetime income test. Under this test, we first ask whether the taxpayer's existing treatment would have "permanently avoided the reporting of income over the taxpayer's lifetime income or merely postponed the reporting of income." *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 723 (1982) (citing *Graff Chevrolet Co.*, 343 F.2d at 572); *see Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 798 (11th Cir. 1984) ("The essential characteristic of a 'material item' is that it determines the timing of

---

[29] The parties stipulated that the period of limitations on assessment expired before the issuance of the notice of deficiency for tax years 1987 through 2004, 2006, and 2007; the parties similarly stipulated with respect to tax years 2005 and 2008, while also stipulating that the period of limitations remained open with respect to assessments of deficiency under section 6501(h) (net operating loss carrybacks) for 2005 and under section 6501(i) (reported foreign tax credit carrybacks) and (j) (general business credit carrybacks) for 2008.

**[\*34]** income or deductions."); *Fla. Progress Corp. & Subs. v. Commissioner*, 114. T.C. 587, 603 (2000), *aff'd*, 348 F.3d 954 (11th Cir. 2003); *Pelaez & Sons, Inc. v. Commissioner*, 114 T.C. 473, 489 (2000) (deeming taxpayer's decision to deduct rather than capitalize expense "a timing question and not a one-time inclusion or deduction"), *aff'd*, 253 F.3d 711 (11th Cir. 2001); *Wienke v. Commissioner*, T.C. Memo. 2020-143, at \*29 ("An item is 'material' when it affects the timing of reporting income or deductions, as opposed to '*how much* income is reported, or whether a deduction would *ever* have been appropriate.'" (quoting *Rankin v. Commissioner*, 138 F.3d at 1288)). If "an accounting practice does nothing more than postpone the reporting of income," it is a material item. *Fla. Progress Corp.*, 114 T.C. at 603; *see also Huffman v. Commissioner*, 126 T.C. 322, 343 (2006) (concluding that erroneous original treatment would not result in "permanent omission of income" where error would "self correct" in the aggregate over time), *aff'd*, 518 F.3d 357 (6th Cir. 2008); *Hawse v. Commissioner*, T.C. Memo. 2015-99, at \*29. If the taxpayer's treatment is in fact a material item, we proceed to the second question: whether a change in the taxpayer's treatment of the material item would result in no more or less income to the taxpayer over the course of its lifetime. *See, e.g.*, *Primo Pants Co.*, 78 T.C. at 723–24. If the change would not affect the taxpayer's lifetime income, it implicates timing and is a change in method of accounting. The U.S. Court of Appeals for the Seventh Circuit—to which an appeal in this case would lie, absent stipulation to the contrary, *see* § 7482(b)(1)(B), (2)—has recognized the rationale for the lifetime income test in the context of section 481:

> When a taxpayer uses an accounting method which reflects an expense before it is proper to do so or which defers an item of income that should be reported currently, he has not succeeded (and does not purport to have succeeded) in permanently avoiding the reporting of any income; he has impliedly promised to report that income at a later date, when his accounting method, improper though it may be, would require it. Section 481, therefore, does not hold the taxpayer to any income which he has any reason to believe he has avoided, and does not frustrate the policy that men should be able, after a certain time, to be confident that past wrongs are set at rest.

*Peoples Bank & Tr. Co. v. Commissioner*, 415 F.2d at 1344 (quoting Note, *Problems Arising from Changes in Tax-Accounting Methods*, 73

**[\*35]** Harv. L. Rev. 1564, 1576 (1960)); *accord Graff Chevrolet Co.*, 343 F.2d at 571–72.

The parties base their respective positions on competing versions of the lifetime income test. Petitioner contends that, because its prior return treatment permanently excluded the Program revenue and never claimed deductions with respect to Program expenses, timing issues were not implicated and thus its treatment was not a material item. In contrast, respondent argues that the change in petitioner's tax treatment of the Fund would not affect the aggregate amount of petitioner's lifetime taxable income (i.e., gross income minus deductions, *see* § 63(a)). In respondent's more results-based view, both petitioner's prior and current treatment of the Fund as a whole (i.e., encompassing both income and deduction components) would result in zero aggregate lifetime taxable income to petitioner, thus implicating questions of timing rather than inclusion.

We reject respondent's formulation of the lifetime income test in that it disregards the preliminary question of whether a taxpayer's existing treatment constituted a material item. We largely agree with petitioner's formulation of the lifetime income test, which accords with the text of the regulation[30] and our precedents.[31] *See Gen. Motors Corp.*

---

[30] As we read the regulatory text, "a change in the treatment of any material item" can occur only if a material item (i.e., "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction") already exists in the first instance. *See* Treas. Reg. § 1.446-1(e)(2)(ii)(*a*), (iii) (example 7) (labeling taxpayer's existing treatment a material item before concluding that a "change in such practice or procedure is a change of method of accounting").

[31] Despite respondent's contentions otherwise, our decision in *Johnson v. Commissioner*, 108 T.C. 448 (1997), *aff'd in part, rev'd in part*, 184 F.3d 786 (8th Cir. 1999), is not to the contrary. In *Johnson*, we concluded that a car dealer taxpayer's initial erroneous exclusion of part of the proceeds of prepaid car service contracts implicated timing issues (i.e., postponement of income) at step one of the lifetime income test. *Id.* at 494. We noted the possibility that particular amounts of the proceeds might never be included in gross income (for instance, if a customer canceled a service contract and received a refund) but observed that the treatment still implicated timing because, in such instances, the taxpayer's practice "resulted in permanent exclusion only where a deduction would have been allowable for a later period." *Id.* at 495. The taxpayer's initial exclusion of the items of income thus implicated timing issues in all instances, because the underlying position was one of temporary deferral and only became permanent in the event of later contingencies. *See Peoples Bank & Tr. Co. v. Commissioner*, 415 F.2d at 1344 (observing that a section 481 adjustment is appropriate where a taxpayer's original treatment "impliedly promised to report that income at a later date"). This made the "exclusion" akin to an

**[\*36]** *& Subs. v. Commissioner*, 112 T.C. 270, 296 (1999) ("An accounting practice that involves the timing of when an item is included in income or when it is deducted is considered a method of accounting."); *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 511 (1989) ("Since [the taxpayer's] pre-1982 method of determining inventory involved the proper time for reporting income, it was a 'material item.'"); *Starer v. Commissioner*, T.C. Memo. 2022-124, at \*15 ("Where a taxpayer's accounting practice permanently avoids reporting of income and accordingly distorts its lifetime income, the practice is not a method of accounting and section 481(a) is inapplicable to a change of the accounting practice." (citing *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588 (1976), *aff'd*, 562 F.2d 39 (2d Cir. 1977))). To reiterate, consistent with the purpose of section 481, we understand the lifetime income test to require looking first to whether the taxpayer's original treatment of an item implicated timing. *See Peoples Bank & Tr. Co. v. Commissioner*, 415 F.2d at 1344 (framing the question as whether the taxpayer's erroneous original treatment "impliedly promised" to report future income). Only when a taxpayer's original treatment implicates timing (i.e., acceleration or postponement of income) do we proceed to analyzing whether a proposed change would distort the taxpayer's lifetime income. *See Knight-Ridder Newspapers, Inc.*, 743 F.2d at 798–99 (characterizing taxpayer's reserve as "an item which affected the timing of a deduction" and concluding that it was a material item and method of accounting).

Framed in these terms, resolution of this issue is clearer. Petitioner's consistent, total exclusion of the Program revenue and nontaking of deductions for Program expenses did not involve timing, at least so long as the Program continued in perpetuity. *See Tate & Lyle, Inc. v. Commissioner*, 103 T.C. 656, 668 (1994) ("The total exclusion of an item from the recipient's gross income is a question of characterization that is unrelated to the taxpayer's method of accounting."), *rev'd on other grounds*, 87 F.3d 99 (3d Cir. 1996); *Hamilton Indus., Inc. v. Commissioner*, 97 T.C. 120, 126 (1991) (stating that a taxpayer does not use a method of accounting where it "entirely

─────────────

accelerated deduction and thus a material item within the meaning of the regulations. *See* Treas. Reg. § 1.446-1(e)(2)(ii)(*a*); *cf. Knight-Ridder Newspapers, Inc.*, 743 F.2d at 799 (analyzing reverse situation where taxpayer erroneously deducted up-front contributions to a reserve and observing that "an equal amount of income" is essentially taxed later upon payment out of the reserve due to the "absence of deductions" that would otherwise have properly been taken). In contrast, petitioner's treatment of the Fund was a position of permanent, total exclusion from gross income and nontaking of deductions, which did not implicate timing issues.

[*37] avoids the inclusion of income in any year"); *Saline Sewer Co. v. Commissioner*, T.C. Memo. 1992-236, 63 T.C.M (CCH) 2832, 2834 (concluding that taxpayer's consistent exclusion of certain fees from gross income was "clearly not a timing issue" implicating section 481).

The only remaining question is how petitioner would have treated any remaining portions of the Fund in the event the Program was terminated. *See Rankin v. Commissioner*, 138 F.3d at 1289 (recognizing timing issue where any remaining money in already-deducted third-party fund would have resulted in income inclusion in the event of termination of fund); *Knight-Ridder Newspapers, Inc.*, 743 F.2d at 799 (recognizing timing issue where already-deducted reserve would have been includible in gross income in the event of a "Day of Armageddon" when reserve was abandoned); *Pinkston*, T.C. Memo. 2020-44, at *15 n.5 ("In determining whether an item postpones or accelerates the reporting of income, courts have generally assumed that relevant future events . . . will ultimately occur."); *cf. Schuster's Express, Inc.*, 66 T.C. at 596 (finding no method of accounting, where Commissioner bore burden of proof, because taxpayer's existing treatment did not involve any "procedure or intention" to include excessive deduction amounts in gross income in future tax years).

Petitioner produced testimony from Hyatt personnel and expert testimony from an accounting expert, all of which professed that any remaining balance of the Fund would have been refunded to the participating hotel owners in the event of Program termination, and thus petitioner would still not have reported the Fund in gross income or taken deductions. We find that testimony to be credible as to petitioner's position and largely uncontroverted by respondent. Communications between petitioner and its external auditors at Deloitte and several state revenue agencies reinforced this testimony. In such communications, which were made in the context of auditing petitioner's annual financial statements and addressing its potential state tax exposure, respectively, petitioner's representatives repeatedly represented that the balance of the Fund would be refunded to participating hotel owners in the event of Program termination. Further, contractual terms in some of the applicable agreements with TPHOs represented that any amounts remaining in the Fund on termination would be distributed to the then-participating Hyatt-branded hotel owners. On the record before us, we see no reason to doubt that petitioner would have continued to adhere to its erroneous exclusionary treatment of the Fund, even in the event of Program

[*38] termination.[32]   *Cf. George K. Herman Chevrolet, Inc. v. Commissioner*, 39 T.C. 846, 848–49 (1963) (discussing analogous practice by which General Motors refunded collective advertising fund to car dealers upon termination of advertising program).  We conclude that petitioner's prior treatment of the Program revenue was not a material item and thus not a method of accounting.  Consequently, we will not sustain respondent's determination of a section 481 adjustment.

Respondent argues that, absent a section 481 adjustment, petitioner will, for the years at issue and future years, be entitled to deduct compensation payments relating to Program revenue permanently excluded from gross income, resulting in a windfall for petitioner.  It is true that respondent has conceded that result for purposes of the years at issue.[33]   But we do not see why the same treatment would necessarily be appropriate in future years after our decision.  A number of doctrines (e.g., the duty of consistency or clear reflection of income principles) may prevent a taxpayer from claiming a deduction when the corresponding income has not been subject to tax, *see, e.g.*, *Kielmar v. Commissioner*, 884 F.2d 959, 965 (7th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *Hintz v. Commissioner*, 712 F.2d 281, 284 (7th Cir. 1983), *aff'g* T.C. Memo. 1981-425, and respondent is free to assert their application in a future case.  That he did not do so here is no fault of petitioner's and does not entitle respondent to a section 481 adjustment when the requirements of that section are unmet.

---

[32] We note that, even in the unlikely event that all TPHOs deflagged from the Hyatt brand before such a Program termination, petitioner would still have been able to pay out the balance of the Fund to its own subsidiaries in their capacity as hotel owners.

[33] *See* Respondent's First Amendment to Answer, at 1 ("Hyatt Corporation must report the Program income in the year received or accrued under IRC § 448 and IRC § 451, and the expenses of the Program are deductible per IRC § 162 and IRC § 461."); Respondent's Pretrial Memorandum, at 53 ("[I]f the Court were to determine that Hyatt Corporation must recognize the Program Revenue and Program expenses beginning in the taxable year 2009 but section 481 did not apply to this change in reporting, Hyatt Corporation would be able to deduct amounts paid from the Program Assets consisting of pre-2009 net Program Revenue whose receipt was not recognized as income."); Respondent's Simultaneous Opening Brief, at 197 ("Were it held otherwise, Hyatt Corporation would receive a significant windfall, because Hyatt Corporation would never recognize over $200 million in income and yet be able to deduct its spending of this income.").

**[\*39]** IV. *Trading Stamp Method*

The general rule for accrual method taxpayers is that a liability is incurred and thus taken into account for federal income tax purposes once it has satisfied the all events test. *See, e.g.*, *Hoops, LP v. Commissioner*, T.C. Memo. 2022-9, at \*9–10, *aff'd*, 77 F.4th 557 (7th Cir. 2023). Under the all events test, a liability is incurred for the taxable year when (1) "all the events have occurred that establish the fact of the liability"; (2) "the amount of the liability can be determined with reasonable accuracy"; and (3) "economic performance has occurred with respect to the liability." Treas. Reg. § 1.461-1(a)(2)(i); *see* § 461(h). The economic performance requirement does not apply "to any item for which a deduction is allowable under a provision of this title which specifically provides for a deduction for a reserve for estimated expenses." § 461(h)(5). The regulations instruct that, for accrual method taxpayers, applicable statutory or regulatory provisions and guidance may also otherwise prescribe when an incurred liability is taken into account. *See* Treas. Reg. §§ 1.461-1(a)(2)(i), 1.446-1(c)(1)(ii)(A).

A longstanding regulatory provision offers a narrow, de facto exception to the all events test for an accrual method taxpayer that (1) "issues trading stamps or premium coupons with sales" and (2) "such stamps or coupons are redeemable by such taxpayer in merchandise, cash, or other property."[34] Treas. Reg. § 1.451-4(a)(1); *see Cap. One Fin. Corp. v. Commissioner*, 133 T.C. 136, 197 (2009), *aff'd*, 659 F.3d 316 (4th Cir. 2011). If both conditions are applicable, the taxpayer may offset against gross receipts from such sales an amount equal to "[t]he cost to the taxpayer of merchandise, cash, and other property used for

---

[34] As the historical analog to modern rewards points, trading stamps and premium coupons were generally physical pieces of adhesive paper issued by a retailer as promotions with sales of their product; once collected in a sufficient number, the stamps or coupons were redeemable for a product chosen from the retailer's store or a catalog. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 236–38 (1972); *Safeway Stores, Inc. v. Okla. Retail Grocers Ass'n*, 360 U.S. 334, 338 (1959); *Tanner v. Little*, 240 U.S. 369, 370–72 (1916); *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 783–84 (9th Cir. 2012); *Sperry & Hutchinson Co. v. O'Neill-Adams Co.*, 185 F. 231, 233–34 (2d Cir. 1911); *Colgate & Co. v. United States*, 66 Ct. Cl. 510, 514–16 (1928); *see also Giant Eagle, Inc. v. Commissioner*, T.C. Memo. 2014-146, at \*12 (holding that reward discounts on purchase price were not premium coupons), *rev'd on other grounds*, 822 F.3d 666 (3d Cir. 2016); Staff of J. Comm. on Tax'n, 95th Cong., General Explanation of the Revenue Act of 1978, JCS-7-79, at 244 (J. Comm. Print 1979) ("Ordinarily, a discount coupon is individually redeemable, while the premium coupon is intended to be collected and redeemed in large numbers for a single product.").

**[\*40]** redemptions in the taxable year" plus "the net addition to the provision for future redemptions during the taxable year." Treas. Reg. § 1.451-4(a)(1). The "provision for future redemptions" is "the number of trading stamps or coupons outstanding as of the end of such year that it is reasonably estimated will ultimately be presented for redemption," multiplied by "the estimated average cost" of "acquiring the merchandise, cash, or other property needed to redeem such stamps or coupons." *Id.* para. (b)(1). A "net addition" exists if the current tax year's provision for future redemptions exceeds the previous tax year's provision for future redemptions. *Id.* subpara. (2).

Accordingly, the trading stamp method effectively accelerates what otherwise would have been future year deductions and serves as an exception to the general rule that reserves for contingent liabilities are not deductible. *See Brown v. Helvering*, 291 U.S. 193, 200–01 (1934); *Lucas v. Am. Code Co.*, 280 U.S. 445, 452 (1930). The regulation's purpose is to match sales revenues with the expenses incurred in generating those revenues (i.e., effectively treating the future redemption cost of stamps or coupons as part of the present cost of goods sold). *See Tex. Instruments, Inc. v. Commissioner*, T.C. Memo. 1992-306, 63 T.C.M. (CCH) 3070, 3071; *see also United States v. O.J. Morrison Stores of Fairmont*, 99 F.2d 77, 79 (4th Cir. 1938). Accordingly, the trading stamp method recognizes the economic reality that an initial sale price will reflect both "the value of the goods currently delivered and the value of the coupon that can be applied toward a future purchase." W. Eugene Seago & Edward J. Schnee, *Tax Accounting for Coupons Under the Special Rules in the Regulations*, 112 J. Tax'n 295, 297 (2010).

As applied to this case, the trading stamp method would allow petitioner to offset against gross receipts both (1) the cost of current year redemptions (i.e., current year compensation payments) and (2) the net addition to the estimated cost of future tax year redemptions that corresponds to rewards points issued to members during the taxable year. The parties vigorously contest whether petitioner is entitled to adopt the trading stamp method. The parties' primary disagreement rests on the question of whether the rewards points were redeemable in "merchandise, cash, or other property," as required by the regulation.[35]

---

[35] Respondent also raises several other procedural issues that he claims independently bar petitioner's adoption of the trading stamp method. Given our

**[\*41]**  Respondent argues that petitioner has failed to establish that the trading stamp method is applicable, because the rewards points at issue were redeemable for services (i.e., hotel stays and air travel), rather than "merchandise, cash, or other property."  *See* Treas. Reg. § 1.451-4(a)(1).  Petitioner contends that the rewards points were redeemable instead for the right to receive a hotel stay or airline miles, which petitioner contends are both "other property" within the meaning of Treasury Regulation § 1.451-4(a)(1).  Petitioner characterizes the former as an intangible property right "in the form of a reservation to use a hotel room at a particular time and place at no charge."  Petitioner also emphasizes that a member can redeem her own rewards points for another person's hotel stay, which, petitioner claims, is an assignment of a property right.

As a matter of state law (largely as viewed through the prism of federal bankruptcy law), the majority view is that hotel guests are contractual licensees possessing a license to use hotel premises.  *See, e.g., Young v. Harrison*, 284 F.3d 863, 868–69 (8th Cir. 2002) (South Dakota law); *Patel v. Northfield Ins. Co.*, 940 F. Supp. 995, 1002 (N.D. Tex. 1996) (Texas law); *Great-W. Life & Annuity Assur. Co. v. Parke Imperial Canton, Ltd.*, 177 B.R. 843, 858 (N.D. Ohio 1994) (Ohio law); *Hari Ram, Inc. v. Magnolia Portfolio, LLC* (*In re Hari Ram, Inc.*), 507 B.R. 114, 122–23 (Bankr. M.D. Pa. 2014) (Pennsylvania law); *Casco N. Bank, N.A. v. Green Corp.* (*In re Green Corp.*), 154 B.R. 819, 823–24 (Bankr. D. Me. 1993) (Maine law); *Mid-City Hotel Assocs. v. Prudential Ins. Co. of Am.* (*In re Mid-City Hotel Assocs.*), 114 B.R. 634, 640–41 (Bankr. D. Minn. 1990) (Minnesota law); *Kearney Hotel Partners v. Richardson* (*In re Kearney Hotel Partners*), 92 B.R. 95, 99 (Bankr. S.D.N.Y. 1988) (Nebraska law).  A minority of courts consider hotel guests to possess leasehold interests, albeit short ones, in their hotel rooms.  *See In re Old Colony, LLC*, 476 B.R. 1, 21–23 (Bankr. D. Mass. 2012) (Wyoming law); *In re Churchill Props. VIII Ltd. P'ship*, 164 B.R. 607, 609 (Bankr. N.D. Ill. 1994) (Iowa law); *see also Travelers Ins. Co. v. First Nat'l Bank of Blue Island*, 621 N.E.2d 209, 213–14 (Ill. App. Ct. 1993) (characterizing hotel receipts as "rent" and suggesting that distinction between hotel guest and a tenant is insubstantial).  In other contexts, airline rewards miles are understood to be intangible property.  *See United States v. Loney*, 959 F.2d 1332, 1336 (5th Cir. 1992) (construing "property" in federal wire fraud statute to encompass airline miles); *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008)

---

conclusion below on the merits of whether the trading stamp method is applicable, we need not address these issues.

**[\*42]** (characterizing party's airline miles as a "credit with the airline" and thus an intangible property right).

We need not resolve whether a hotel stay is better characterized as a license or a leasehold. Regardless of the proper characterization, the regulatory text does not support a broad reading that a license or leasehold (or airline miles) would qualify as "other property" within the meaning of the regulation. In determining the plain meaning of the catchall category in the phrase "merchandise, cash, or other property," the interpretive canon of ejusdem generis is particularly useful. *See AptarGroup Inc. v. Commissioner*, 158 T.C. 110, 116 (2022) ("We interpret regulations using canons of statutory construction . . . ." (citing *Austin v. Commissioner*, 141 T.C. 551, 563 (2013))). The canon counsels that when "a more general term follows more specific terms in a list, the general term is usually understood to 'embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018) (quoting and citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001), and citing *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 628–29 (2018)); *see Agro-Jal Farming Enters., Inc. v. Commissioner*, 145 T.C. 145, 154 (2015); *cf. Mancini v. Commissioner*, T.C. Memo. 2019-16, at \*19 (describing this Court's longstanding interpretation that the catchall category in the phrase "fire, storm, shipwreck, or other casualty" in section 165 "must mean something like the specific terms that precede it"), *aff'd*, 851 F. App'x 769 (9th Cir. 2021).

Applying the canon here readily illustrates the flaw in petitioner's broad interpretation of the catchall category.[36] In the tax law, "merchandise" has long been understood as a term of art, meaning "goods held for sale" by the taxpayer. *See RACMP Enters., Inc. v. Commissioner*, 114 T.C. 211, 221–22 (2000) (noting that all relevant definitions of "merchandise" "refer to property that is held for sale, not simply property that is sold"); *King Solarman, Inc. v. Commissioner*, T.C. Memo. 2019-103, at \*22, *aff'd*, 840 F. App'x 74 (9th Cir. 2020); *Wilkinson-Beane, Inc. v. Commissioner*, T.C. Memo. 1969-79, 28 T.C.M. (CCH) 450, 456, *aff'd*, 420 F.2d 352 (1st Cir. 1970). Cash is understood as "[m]oney or its equivalent," i.e., "[c]urrency or coins, negotiable checks, and balances in bank accounts." *Cash, Black's Law Dictionary*

---

[36] The related canon of noscitur a sociis ("a word is known by the company it keeps") similarly counsels that we "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

**[\*43]** (11th ed. 2019). Understanding "other property" to broadly encompass all manner of property rights eclipses the carefully delineated "merchandise" and "cash" categories and renders them surplusage—an undesirable interpretive outcome. *See Yates v. United States*, 574 U.S. 528, 545–46 (2015) (applying ejusdem generis so as to preclude broad reading of phrase "tangible object" that would have rendered statute's prior use of terms "record" and "document" surplusage); *Sutherland v. Commissioner*, 155 T.C. 95, 103–04 (2020). Further, given the regulation's use of "or" in the phrase "merchandise, cash, or other property," we presume that the categories are disjunctive and carry nonoverlapping, separate meanings. *See United States v. Woods*, 571 U.S. 31, 45–46 (2013). Applying ejusdem generis carefully gives separate effect to all three categories, by limiting the scope of "other property" to property similar in nature to "merchandise" and "cash," such as, at a high level of generality, tangible property.[37] The canon thus strongly suggests at the outset that this narrower reading is the better one.

Treasury Regulation § 1.451-4(b)(1)(iii) lends contextual support to the narrower reading. Subdivision (iii) provides that the taxpayer may include in its offset to gross receipts the "transportation or other necessary charges in acquiring possession of the *goods*." (Emphasis added.) Subdivision (iii) further specifies that the costs of "*transporting* merchandise or *other property* from a central warehouse to a branch warehouse" or "*storing* the merchandise or *other property*" may not be included in the offset and are instead subject to either section 162 or 263. *Id.* (emphasis added). The provision thus repeatedly contemplates "other property" in tangible terms, speaking of physical possession, transportation, and storage. We find that subdivision (iii) further reinforces the application of ejusdem generis by suggesting that a common characteristic of the three categories is tangibility.

We thus interpret the catchall category to apply only to property similar in nature to "merchandise" and "cash." We reject petitioner's contention that the catchall category encompasses the hotel stays or airline miles redeemable by petitioner's Program members. Accordingly, we conclude that the trading stamp method is not available

---

[37] One reasonable reading, which we note but do not expressly adopt, is that "other property" contemplates physical goods that are not "merchandise" in the hands of the taxpayer. We need not determine the exact scope of the "other property" category here and expressly limit our conclusion to rejecting petitioner's contention that it broadly encompasses the intangible property at issue.

**[*44]** to petitioner with respect to the years at issue; petitioner must defer its cost recovery until the taxable year for which compensation payments give rise to a deductible expense.

V.    *Conclusion*

We hold that for the years at issue (1) the Program revenue was includible in petitioner's gross income; (2) petitioner's treatment of the Fund was not a method of accounting subject to section 481 adjustment; and (3) petitioner was not entitled to adopt the trading stamp method.

To reflect the foregoing,

*Decision will be entered under Rule 155.*